Honorable John C Coughenour

CC TO JUDGE _DJ_

LODGED

DJ

CLERK
WESTERN

BY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| HARRIS GROUP, INC , a Washington corporation,<br><br>            Plaintiff,<br><br>  v<br><br>FIDELITY & DEPOSIT COMPANY OF MARYLAND, as subrogee to WALSH CONSTRUCTION COMPANY,<br><br>            Defendant | No  CV03 0118C<br><br><br>DECLARATION OF RICHARD KOWALCZYK<br><br><br>CV 03-00118  #00000021 |

I, Richard Kowalczyk, declare as follows

1    I am currently employed by Fidelity and Deposit Company of Maryland

("F&D") as senior claims attorney   I make this declaration based upon personal knowledge

2    Exhibit A to my declaration is a true and correct copy of Performance Bond

No  6565434 issued by F&D in the penal amount of $31,656,644   That bond names KFx

Fuel Partners, L.P  ("KFP") as obligee and Walsh Construction Company, a Division of Guy

F  Atkinson Company as principal

KOWALCZYK DECLARATION        1 –
(CV03 0118C)

ORIGINAL

**OLES MORRISON RINKER & BAKER LLP**
701 PIKE STREET, SUITE 1700
SEATTLE, WA  98101-3930
PHONE  (206) 623-3427
FAX  (206) 682-6234

3       Exhibit B to my declaration is a true and correct copy of the United States

Bankruptcy Court's March 31, 2000 Amended Joint Plan of Reorganization for ATKN

Company of California and ATKN Company, filed in Case No 97-33694-TC

4       Exhibit C to my declaration is a true and correct copy of the United States

Bankruptcy Court's January 9, 1998 Order Authorizing Interim Procedures Agreement with

Clark, filed in Case No 97-33694-TC

I declare under penalty of perjury under the laws of the State of Maryland and the

United States of America that the foregoing is true and correct

Executed in Baltimore, Maryland this 11th day of March, 2003

Richard Kowalczyk

KOWALCZYK DECLARATION       - 2 -
(No. CV03 0118C)

OLES MORRISON RINKER & BAKER LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE (206) 623-3427
FAX (206) 682-6234

02/05/88   THU 11:17 FAX 818 383 6287      WALSH CONST.

BOND NO. 6565434                                          Page 1 of 2

## PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS, That Walsh Construction Company, a Division of Guy F. Atkinson Company, a Nevada corporation, of 101 Oakview Drive, Trumbull, Connecticut 06611, as Principal (hereinafter called the "Principal" or the "Contractor"), and Fidelity and Deposit Company of Maryland, a Maryland Corporation, of 225 South Lake Avenue, Suite 700, Pasadena, California 91101, and Universal Underwriters Insurance Company, a Missouri Corporation, of 225 South Lake Avenue, Suite 700, Pasadena, California 91101, acting jointly and severally as Surety (hereinafter called the "Surety"), are held and firmly bound unto Kfx Fuel Partners, L.P. a Delaware limited partnership (hereinafter called the "Obligee"), in the sum of Thirty One Million Six Hundred Fifty Six Thousand Six Hundred Forty Four Dollars ($31,656,644.), for the payment of which sum well and truly to be made, the Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal and the Obligee have entered into a written Turnkey Design and Construction Agreement dated ___August 18 1995___ (hereinafter called the "Agreement"), for the performance by the Principal, as Contractor, of the design, procurement, construction, and start-up of a coal beneficiation plant located in Gilette, Wyoming, all as more fully described and mentioned in said Agreement, which Agreement is hereby incorporated in and made a part of this Bond with the same force and effect as if fully set forth at length herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounded Principal shall well and truly perform all of the undertakings, covenants, terms, conditions and agreements of said Agreement within the time provided therein and any extensions thereof that may be granted the Obligee, and during the life of any guarantees contained in or required under said Agreement and shall also well and truly perform all the undertakings, covenants, terms, conditions and agreements of any and all modifications of said Agreement that may hereafter be made, and shall indemnify and save harmless the Obligee of and from any and all loss, damage and expenses, including costs and attorneys' fees which the Obligee may sustain by reason of the Principal's failure, neglect and/or refusal so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The Surety, for value received agrees that its obligation shall in nowise be impaired or affected by any change, extension of time, alteration, addition, omission or other modification in or of the said Agreement or the work to be performed thereunder and does hereby waive notice of any and all such changes, extensions of time, alterations, additions, omissions, and/or other modifications.

Whenever Principal shall be, and declared by Obligee to be in default under the Contract the Obligee having performed Obligee's obligations thereunder, the Surety may promptly remedy the default, or shall promptly

(1) Complete the Agreement in accordance with its terms and conditions, or

EXHIBIT _____A_____

Page ___1___ of ___8___ Pages

880-40L  60/20 d  822-1                                    :moɹℲ  85:ÞL  86-S0-8ᔭ

02/05/98   THU 11:17 FAX 916 363 8287          WALSH CONST.                                    ☒003

BOND NO. 6565434                                                      Page 2 of 2

(2)  Obtain a bid or bids for submission to Obligee for completing the
Agreement in accordance with its terms and conditions, and upon
determination by Obligee and Surety of the lowest responsible
bidder, arrange for a contract between such bidder and Obligee and
make available as work progresses (even though there should be a
default or a succession of defaults under the contract or contracts
of completion arranged under this paragraph) sufficient funds to pay
the cost of completion less the balance of the contract price; but
not exceeding, including other costs and damages for which the
Surety may be liable hereunder, the amount set forth in the first
paragraph hereof. The term "Balance of the contract price", as used
in this paragraph, shall mean the total amount payable by Obligee to
Contractor under the Agreement and any amendments thereto, less the
amount properly paid by Obligee to Contractor.

This Bond shall be for the sole benefit of the Obligee, and its
successors and assigns.

IN WITNESS WHEREOF, the Principal and Surety have hereunto affixed their
corporate seals and caused this Bond to be duly executed and acknowledged by
their duly authorized officers and representatives this _____21st_____ day
of ___August___, 19 95 .

                              Walsh Construction Company, a Division
                              of Guy F. Atkinson Company (Principal)

                              By: _____

Countersigned
        by: _Debra K. Stoddard_          Fidelity and Deposit Company of Maryland
            Debra K. Stoddard            (Surety)
            WY Resident Agent
            C. R. Motis Ins. Agency
            Casper, WY                   By: _____
                                         Andrew K. Pratt, Attorney-in-Fact

                              Universal Underwriters Insurance Company
                              (Surety)

                              By: _____
                                  Andrew K. Platt, Attorney-in-Fact

                              EXHIBIT___A___
                              Page___2___of___8___Pages

T-228  P 03/03  Job-488                                         FEB-06-98  15:00  From:

02/05/98   THU 11:18 FAX 918 383 6287          WALSH CONST.                              004

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of _____California_____ }

County of ____LOS ANGELES____ }

On _August 2, 1995_ before me, ____NORMA O. BURBANO____, Notary Public,

personally appeared _____ANDREW K. PLATT_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



WITNESS my hand and official seal.

_Norma O. Burbano_

EXHIBIT _A_

Page__3__of__8__Pages

02/06/98   THU 11:18 FAX 916 383 6287        WALSH CONST.

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of ___California___

County of ___LOS ANGELES___

On __August 21, 1995__ before me,   ___NORMA O. BURBANO___ , Notary Public.

personally appeared _____ANDREW K. PLATT_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



WITNESS my hand and official seal.

_Norma O. Burbano_

EXHIBIT ___A___
Page___4___of___8___Pages

02/05/98  THU 11:18 FAX 916 363 6287     WALSH CONST.                    ☉006

## WALSH CONSTRUCTION COMPANY

### Certificate of Authorization

I, Joseph A. Glorioso, duly elected Assistant Secretary of Guy F. Atkinson Company, a Nevada corporation, hereby certify that the following resolution was duly adopted by the Board of Directors of said Company at a meeting held on April 20, 1995:

> RESOLVED  That each of the following is hereby elected to the office indicated and on behalf of the division indicated and that all offices not indicated be vacated:

#### Walsh Construction Company

| | |
|---|---|
| T. J. Walsh, III | - President and General Manager |
| S. L. Koch | - Senior Vice President, Manager of Eastern Operations |
| Donald E. Orr | - Senior Vice President & General Counsel |
| P. R. Danzi | - Vice President, Manager of Western Operations |
| J. P. Donegan | - Vice President, Estimating |
| J. A. Glorioso | - Vice President and Controller |
| A. J. Maiorano | - Vice President, Construction |
| R. E. Simms | - Vice President |
| D. M. Welch | - Vice President, Project Development |

and that each is authorized for and in the name of Guy F. Atkinson Company to carry on operations and to perform duties of an executive officer of Guy F. Atkinson Company other than the borrowing of money insofar as those duties relate to their division; and in connection therewith each of them is hereby specifically authorized to represent the division and Guy F. Atkinson Company at any meetings or conferences, to sign letters, purchase orders, bids, proposals, contracts, supplements, change orders, bonds, checks, progress government vouchers, affidavits, certificates and releases, to make protests and appeals, to certify state or federal government contract claims, including specifically those governed by the Contract Disputes Act of 1978,, to execute title documents (other than promissory notes, mortgages, or deeds of trust) in connection with the operation of Guy F. Atkinson Company and, generally, to take any and all action necessary or convenient in the performance of the business of Guy F. Atkinson Company.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of August , 1995.

EXHIBIT ___A___
Page___5___ of ___8___ Pages

_____
Assistant Secretary

02/05/98  THU 11:18 FAX 918 383 6287    WALSH CONST.

## Power of Attorney
# FIDELITY AND DEPOSIT COMPANY OF MARYLAND
HOME OFFICE, BALTIMORE, MD.

KNOW ALL MEN BY THESE PRESENTS: That the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a corporation of the State of Maryland, by    C. M. PECOT, JR.    . Vice-President, and    C. W. ROBBINS    Assistant Secretary, in pursuance of authority granted by Article VI, Section 2, of the By-Laws of said Company, which reads as follows:

"The Chairman of the Board, or the President, or any Executive Vice-President, or any of the Senior Vice-Presidents or Vice-Presidents specially authorized so to do by the Board of Directors or by the Executive Committee, shall have power, by and with the concurrence of the Secretary or any one of the Assistant Secretaries, to appoint Resident Vice-Presidents, Assistant Vice-Presidents and Attorneys-in-Fact as the business of the Company may require, or to authorize any person or persons to execute on behalf of the Company any bonds, undertakings, recognizances, stipulations, policies, contracts, agreements, deeds, and releases and assignments of judgments, decrees, mortgages and instruments in the nature of mortgages.... And to affix the seal of the Company thereto."

does hereby nominate constitute and appoint  Andrew K. Platt of Los Angeles, California

its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed:  any and all bonds and undertakings...................................

And the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Company, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its office in Baltimore, Md., in their own proper persons.

The said Assistant Secretary does hereby certify that the aforegoing is a true copy of Article VI, Section 2, of the By-Laws of said Company, and is now in force.

IN WITNESS WHEREOF, the said Vice-President and Assistant Secretary have hereunto subscribed their names and affixed the Corporate Seal of the said FIDELITY AND DEPOSIT COMPANY OF MARYLAND, this _____21st_____ day of _____May_____, A.D. 19 85.

ATTEST:

FIDELITY AND DEPOSIT COMPANY OF MARYLAND

*C W Robbins*
Assistant Secretary

By *C M Pecot*
Vice-President

STATE OF MARYLAND
CITY OF BALTIMORE } ss:

On this  21st  day of    May    , A.D. 19 85 , before the subscriber, a Notary Public of the State of Maryland, in and for the City of Baltimore, duly commissioned and qualified, came the above-named Vice-President and Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and they each acknowledged the execution of the same, and being by me duly sworn, severally and each for himself deposeth and saith, that they are the said officers of the Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and that the said Corporate Seal and their signatures as such officers were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed by Official Seal, at the City of Baltimore, the day and year first above written.

Notary Public Commission Expires   July 1, 1986

## CERTIFICATE

I, the undersigned, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the original Power of Attorney of which the foregoing is a full, true and correct copy, is in full force and effect on the date of this certificate; and I do further certify that the Vice-President who executed the said Power of Attorney was one of the additional Vice-Presidents specially authorized by the Board of Directors to appoint any Attorney-in-Fact as provided in Article VI, Section 2 of the By-Laws of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND.

This Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 16th day of July, 1969.

RESOLVED: "That the facsimile or mechanically reproduced signature of any Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed."

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the said Company, this _____ day of _____, 19___.

EXHIBIT ___A___
Page ___6___ of ___8___ Pages

*J. Gregory Hamilton*
Assistant Secretary

L1684-CK  012

02/05/98   THU 11:19 FAX 916 363 6287        WALSH CONST.                          ☒008

STATE OF CONNECTICUT
COUNTY OF FAIRFIELD

On this the ___21st___ day of ___August___, 1995 before me, ___Gail Gibbons___, the undersigned officer, personally appeared ___Thomas J. Walsh___, known to me to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

_____
Notary Public

Date Commission Expires: ___May 31, 2000___

EXHIBIT ___A___
Page___1___of___8___Pages

02/05/98   THU 11:19 FAX 916 363 6267          WALSH CONST.

# UNIVERSAL UNDERWRITERS INSURANCE COMPANY
6363 College Boulevard · Overland Park, Kansas 66211

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, That the UNIVERSAL UNDERWRITERS INSURANCE COMPANY, a corporation existing under the laws of the State of Missouri with its Executive Offices located in Overland Park, Kansas, does hereby nominate, constitute and appoint:

Andrew K. Platt
Kent T. Roberts
Paul K. Wickersham

its true and lawful Attorneys-in-Fact with power and authority hereby conferred to sign, seal and execute on its behalf, effective with the date of issuance of this power until revoked, bonds, undertakings or obligations in co-suretyship with Fidelity and Deposit Company of Maryland, Baltimore, Maryland, wherein the surety participation of Universal Underwriters Insurance Company does not exceed Twenty-five Million Dollars ($25,000,000) and all of the acts of said Attorneys-in-Fact, pursuant to these presents are hereby ratified and confirmed.

This Power of Attorney is signed and sealed under and by the authority of the following resolution adopted by the Board of Directors of the UNIVERSAL UNDERWRITERS INSURANCE COMPANY at a meeting duly called and held on the 14th day of March, 1995.

RESOLVED, that the Corporation hereby extends to five of its Senior Officers, namely D. E. DESROCHES, R. E. FARMER, L. D. JEFFRIES, R. T. KIRK, AND M. J. RYAN authority to execute written instruments conferring power of attorney to named individuals to execute Surety bonds on behalf of the Corporation subject to limitation as to amount set forth in the instrument.

RESOLVED FURTHER, that the signature of any one of the foregoing Senior Officers of the Corporation and the attesting signature of the Secretary, or an Assistant Secretary of the Corporation and the Seal of the Corporation may be affixed by facsimile on any power of attorney granted pursuant to the foregoing resolution and the signature of the Secretary, or an Assistant Secretary and the Seal of the Corporation may be affixed by facsimile to any Certificate of such Power. Any such Power or any Certificate thereof bearing any such facsimile signature and the Seal Seal be valid and binding on the Corporation. Furthermore, any such Power so executed and sealed and certified by Certificate so executed and sealed with respect to any bond or undertaking to which it is attached, continue to be valid and binding on the Corporation.

IN WITNESS WHEREOF, UNIVERSAL UNDERWRITERS INSURANCE COMPANY has caused these presents to be executed in its name and on its behalf, and its Corporate Seal to be hereto affixed and attested to by its officers thereunto duly authorized, this 27th day of March, 1995.

UNIVERSAL UNDERWRITERS INSURANCE COMPANY

Senior Vice President

STATE OF KANSAS    )
                   ) ss:
COUNTY OF JOHNSON  )

On this 27th day of March, 1995, before the subscriber, a Notary Public of the State and County aforesaid, commissioned and qualified, came the above-named Senior officer and Secretary of UNIVERSAL UNDERWRITERS INSURANCE COMPANY, to me personally known to be the individuals and officers described in and who executed the preceding instrument; and they acknowledged the execution of the same; and being by me duly sworn, they severally and each for himself deposed and said that they respectively, hold the offices in said Corporation as indicated, that the Seal affixed to the preceding instrument is the Corporate Seal of said Corporation, and that the said Corporate Seal, and their signatures as such officers, were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporation authorization.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official Seal the day and year first above written.

Notary Public

My Commission Expires July 8, 1996

Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

## CERTIFICATE

I, the undersigned, a secretary of the UNIVERSAL UNDERWRITERS INSURANCE COMPANY, do hereby certify that the Power of Attorney hereinabove set forth is still in full force and effect, and further certify that the Resolution of the Board of Directors, set forth in said Power of Attorney is still in force. In testimony whereof I have hereunto subscribed my name and affixed my seal of the said Company this _____ day of _____, 19____.

F. Starnes, Secretary

EXHIBIT
Page ___ of ___ Pages

UEAM  3-27-95



1  MURPHY SHENEMAN JULIAN & ROGERS
   A Professional Corporation
2  MARGARET SHENEMAN, ESQ. (State Bar #072718)
   101 California Street, Suite 3900
3  San Francisco, California  94111
   Telephone:  (415) 398-4700
4  Facsimile:   (415) 421-7879

5  Attorneys for Debtors

6  HENRY C. KEVANE, ESQ. (State Bar #125757)
   PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.
7  650 California Street, 15th Floor
   San Francisco, California 94108
8  Telephone:  (415) 263-7000
   Facsimile:   (415) 263-7010
9
   Attorneys for the Official Committee of
10 Unsecured Creditors of ATKN Company

11

12

13                 UNITED STATES BANKRUPTCY COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                       SAN FRANCISCO DIVISION

16

17

18 In re                            )  Chapter 11
                                    )
19 ATKN COMPANY OF CALIFORNIA,      )  Jointly Administered for
   a Delaware corporation, f/k/a    )  Procedural Purposes Only Under
20 Guy F. Atkinson Company of California; )
                                    )  Case No. 97-33694-TC
21 ATKN COMPANY, a Nevada corporation, )
   f/k/a Guy F. Atkinson Company; and )
22                                   )  AMENDED JOINT PLAN OF
   ATKN HOLDINGS, LTD.,             )  REORGANIZATION FOR
23 a Canadian federal corporation,  )  ATKN COMPANY OF
   f/k/a Guy F. Atkinson Holdings, Ltd.; )  CALIFORNIA AND ATKN
24                                   )  COMPANY
                                    )
25              Debtors.            )
                                    )
26 _____ )

27

28 Dated:    March 31, 2000           EXHIBIT  B
              San Francisco, California    Page___1___of_46_Pages

## TABLE OF CONTENTS

PAGE

ARTICLE 1  DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ARTICLE 2  CLASSIFICATION OF CLAIMS . . . . . . . . . . . . . . . . . . . . . . .  17

2.1  Criterion of Class  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
2.2  Classes of Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
2.3  Special Voting Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

ARTICLE 3  TREATMENT OF UNCLASSIFIED CLAIMS . . . . . . . . . . . . . . . . . .  18

3.1  Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
3.2  Administrative Bar Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
3.3  Other Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . .  18
3.4  Priority Tax Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
3.5  Zurich Administrative Claim . . . . . . . . . . . . . . . . . . . . . . . . . .  19
3.6  RO Incentive Compensation  . . . . . . . . . . . . . . . . . . . . . . . . . .  19

ARTICLE 4  TREATMENT OF CLASSIFIED CLAIMS . . . . . . . . . . . . . . . . . .  19

4.1   Class 1 (BC Bank Claim) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
4.2   Class 2 (Bonding Companies' Secured Claim) . . . . . . . . . . . . . . . .  19
4.3   Class 3 (Other Allowed Secured Claims)  . . . . . . . . . . . . . . . . . .  19
4.4   Class 4 (Yale Claim). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
4.5   Class 5 (Priority Employee Claims). . . . . . . . . . . . . . . . . . . . . .  20
4.6   Class 6 (Allowed Convenience Claims). . . . . . . . . . . . . . . . . . . .  20
4.7   Class 7 (Allowed Unsecured Claims) . . . . . . . . . . . . . . . . . . . . .  21
4.8   Class 8 (Subordinated Claims) . . . . . . . . . . . . . . . . . . . . . . . .  21
4.9   Class 9 (Interests and Claims) . . . . . . . . . . . . . . . . . . . . . . . .  21
4.10  Nonconsensual Confirmation. . . . . . . . . . . . . . . . . . . . . . . . . .  21

ARTICLE 5  MEANS FOR IMPLEMENTATION OF THE PLAN  . . . . . . . . . .  . . .  21

5.1   Acquisition of Bank Claim.  . . . . . . . . . . . . . . . . . . . . . . . . . .  21
5.2   Retention of Property of the Debtors' Estates. . . . . . . . . . . . . . . . .  22
5.3   Transfer of Property of the Debtors' Estates  . . . . . . . . . . . . . . . .  22
5.4   Allowance of Bonding Companies' Unsecured Claim. . . . . . . . . . . . .  23
5.5   Disposition of Holdings Trust Claims. . . . . . . . . . . . . . . . . . . . .  23
5.6   Integration of Holdings Trust  . . . . . . . . . . . . . . . . . . . . . . . . .  24
5.7   Disposition of Holdings Chapter 11 Case. . . . . . . . . . . . . . . . . . .  24
5.8   Settlement of Intercreditor Appeals and Intercreditor Litigation. . . . . . . . . . .  24
5.9   General Mutual Releases. . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
5.10  Substantive Consolidation. . . . . . . . . . . . . . . . . . . . . . . . . . .  24
5.11  Colma. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
5.12  Exemption from Certain Taxes for Plan Transactions and Trumbull Sale  .  25
5.13  Intercreditor Subordination.  . . . . . . . . . . . . . . . . . . . . . . . . .  25
5.14  Conduct and Treatment of Kiani Claim. . . . . . . . . . . . . . . . . . . .  25
5.15  Conduct and Treatment of Solar Tax Litigation. . . . . . . . . . . . . .  25

AMENDED JOINT PLAN OF REORGANIZATION

EXHIBIT ___*B*___
Page __2__ of __46__ Pages

5.16    Conduct of Auditor Litigation. . . . . . . . . . . . . . . . . . . . . . . . .   26
5.17    D&O Litigation Injunction. . . . . . . . . . . . . . . . . . . . . . . . . .   26
5.18    Appointment of Estate Representative  . . . . . . . . . . . . . . . . . . .   26
5.19    Dismissal of Bonded Project Avoidance Actions and Release of AICCO . . . .   26
5.20    Payment of Reorganized Debtor Expenses . . . . . . . . . . . . . . . . .   26
5.21    Power and Authority of Responsible Officer  . . . . . . . . . . . . . . .   26
5.22    Postconfirmation Operations of the Debtors.  . . . . . . . . . . . . . . .   27
5.23    Windup of Affiliate Affairs. . . . . . . . . . . . . . . . . . . . . . . .   27
5.24    Treatment of Employee Benefit Programs.  . . . . . . . . . . . . . . . .   27
5.25    Abandonment Following Effective Date . . . . . . . . . . . . . . . . . .   27
5.26    Distribution of Net Plan Proceeds . . . . . . . . . . . . . . . . . . . .   28
5.27    Full and Final Satisfaction. . . . . . . . . . . . . . . . . . . . . . . .   28
5.28    Effect of Allowed Convenience Claim Reduction Election. . . . . . . . . .   28
5.29    Distribution Procedures.  . . . . . . . . . . . . . . . . . . . . . . . . .   28
5.30    Disbursing Agent. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
5.31    Claims Reserve Account. . . . . . . . . . . . . . . . . . . . . . . . . .   29
5.32    Resolution of Disputed Claims. . . . . . . . . . . . . . . . . . . . . . .   29
5.33    Reserve Provisions for Disputed Claims.  . . . . . . . . . . . . . . . . .   29
5.34    Disputed Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
5.35    Unclaimed Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
5.36    Setoffs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
5.37    Withholding Taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
5.38    Designation of Distributions on Account of Certain Tax Claims. . . . . .   31
5.39    Effect of Distributions Other Than Under This Plan. . . . . . . . . . . .   31

ARTICLE 6   EXECUTORY CONTRACTS, LITIGATION AND INSURANCE . . . . . . .   31

6.1    Executory Contracts and Unexpired Leases. . . . . . . . . . . . . . . . . .   31
6.2    Satisfaction of Assumption Obligations. . . . . . . . . . . . . . . . . . .   32
6.3    Effect of Confirmation Order. . . . . . . . . . . . . . . . . . . . . . . . .   32
6.4    Postpetition Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . .   33
6.5    Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
6.6    Avoidance Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
6.7    Indemnification Obligations. . . . . . . . . . . . . . . . . . . . . . . . .   33

ARTICLE 7   CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN  . . . .   33

ARTICLE 8   CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN  . . .   34

ARTICLE 9   EFFECTS OF CONFIRMATION . . . . . . . . . . . . . . . . . . . . . .   35

9.1    Binding Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
9.2    Revesting of Property of Debtors. . . . . . . . . . . . . . . . . . . . . . .   35
9.3    Property Free and Clear . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
9.4    Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
9.5    Channeling of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
9.6    Limitation of Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
9.7    No Effect on Other Entity Liability. . . . . . . . . . . . . . . . . . . . . .   36

ARTICLE 10 RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . .   36

EXHIBIT B
Page ___5___ of __46__ Pages

ARTICLE 11  MISCELLANEOUS  ..................................  37

    11.1  Role of Committee.  ....................................  37
    11.2  Defects, Omissions and Amendments.  .......................  37
    11.3  Filing of Plan Agreements and Other Documents.  ..............  37
    11.4  Governing Law.  ......................................  38
    11.5  Severability.  ........................................  38
    11.6  Successors and Assigns.  ................................  38
    11.7  Revocation and Withdrawal.  .............................  38
    11.8  Interpretation  .......................................  38
    11.9  Implementation and Cooperation.  .........................  39

EXHIBIT A  Assumed Contracts and Leases  ......................  39

ATKN Company of California, ATKN Company, and the Official Committee of Unsecured Creditors of ATKN Company propose the following Amended Joint Plan of Reorganization pursuant to Section 1121(c) of the Bankruptcy Code. All Creditors should review the Disclosure Statement, and its accompanying exhibits and other information, before voting to accept or reject the Plan. No other materials have been approved by the Bankruptcy Court for use in soliciting acceptances or rejections of this Plan.

## ARTICLE 1

### DEFINITIONS

For purposes of this Plan, all capitalized terms used herein and not otherwise defined shall have the meanings set forth below. A term used, but not defined, in the Plan but defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to it in the Bankruptcy Code or the Bankruptcy Rules, unless the context clearly requires otherwise The rules of construction used in Section 102 of the Bankruptcy Code shall apply to construction of this Plan. Headings and captions are utilized in this Plan for convenient reference only, and shall not constitute a part of this Plan for any other purpose.

1.1    "Administrative Claim" means a Claim for an administrative expense of the Debtors, arising during the period commencing on the Filing Date and ending on the Effective Date, allowed under Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(1) of the Bankruptcy Code including, but not limited to, (i) any actual and necessary cost or expense of preserving the Estates or operating the Debtors' business, (ii) administrative expenses previously allowed by the Bankruptcy Court, (iii) any Tax Claims incurred by the Estates after the Filing Date, (iv) Professional Fees, and (v) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930. For purposes of this Plan, Administrative Claims shall also include Plan Payments and Assumption Obligations, if any.

1.2    "Administrative Bar Date" means March 23, 2000, the last date established under the Administrative Bar Date Order by which certain entities asserting an administrative expense against the Debtors must have filed a request for payment of administrative expense under Section 503(a) of the Bankruptcy Code, or be forever barred from asserting an administrative expense against the Debtors and/or sharing in any distribution under the Plan, or such other date as may be fixed by order of the Bankruptcy Court after notice and a hearing.

1.3    "Administrative Bar Date Order" means the *Order (1) Approving Disclosure Statement, (2) Setting Balloting Procedures, (3) Setting Claims Bar Dates, and (4) Establishing Related Confirmation Procedures*, entered by the Bankruptcy Court on February 25, 2000

1.4    "Affiliates" means all affiliates of the Debtors within the meaning of Section 101(2) of the Bankruptcy Code including, but not limited to, the entities identified on Exhibit D of the Disclosure Statement, provided that, Affiliates does not include CAPC and Holdings Trust.

1.5    "Agent" means Wells Fargo Bank, N.A., and its successors, as agent for the Banks.

1.6    "AICCO" means A I. Credit Corp.

1.7    "AIG" means the American International Group of Companies, including American Home Assurance Company, together with their successors and assigns

1.8    "AIP" means the *Agreement in Principle* among the Banks, the Debtors, the Holdings Trust, the Committee and the Bonding Companies, dated as of February 9, 2000

1.9   "Allowed Claim" means:

(a)   a Claim that appears in the Schedules, except a Claim that is listed as disputed, contingent or unliquidated;

(b)   a Claim for which a proof of Claim has been timely filed as of the First Bar Date or, if applicable, the Second Bar Date, and no objection thereto has been made on or before any applicable deadline or which is not otherwise a Disputed Claim; or

(c)   a Claim that has been allowed, but only to the extent allowed (x) by a Final Order, (y) under this Plan, or (z) under any agreements entered into in connection with this Plan establishing the amount and nature of any Claim..

"Allowed Claim" shall not include interest accrued after the Filing Date on the amount of any Claim except with respect to an Allowed Secured Claim as permitted by Section 506(b) of the Bankruptcy Code.

1.10   "Allowed Convenience Claim" means all Allowed Unsecured Claims held by a single Creditor that are either (i) less than $2,500 in the aggregate, or (ii) greater than $2,500 in the aggregate but as to which the holder thereof has voluntarily and timely elected in writing to reduce to a single Claim of $2,500 in the manner set forth on the Ballot.

1.11   "Allowed Secured Claim" means that portion of an Allowed Claim, secured by a valid, perfected and enforceable lien that is not subject to avoidance under bankruptcy or non-bankruptcy law, equal to the value, as determined by the Bankruptcy Court pursuant to Sections 506(a) and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 3012, of (i) the interest of the holder of such Allowed Claim in the property of the Debtors securing such Allowed Claim, or (ii) the amount subject to setoff under Section 553 of the Bankruptcy Code.

1.12   "Allowed Unsecured Claim" means any Allowed Claim that is not an Administrative Claim or an Allowed Secured Claim.

1.13   "Assumption Obligations" means any monetary amounts payable to the non-debtor party to any executory contract or unexpired lease, pursuant to Section 365(b)(1) of the Bankruptcy Code, as a condition to the assumption of such contract or lease.

1.14   "Atkinson Cases" means the Chapter 11 Cases, the Holdings Chapter 11 Case, and the CAPC Chapter 11 Case.

1.15   "ATKN California" means ATKN Company of California, formerly known as Guy F. Atkinson Company of California, a Delaware corporation.

1.16   "ATKN Equity Securities" means (i) all issued and outstanding or authorized but unissued shares of common stock of ATKN California as of the Effective Date, and (ii) any and all rights, options and warrants distributed to stockholders or other officers, directors or employees of the Debtors, whether under one or more contracts or plans in existence on the Filing Date, to sell, purchase, grant or otherwise transfer any shares of common stock of ATKN California under any applicable terms and conditions.

1.17   "ATKN Intercompany Claims" means the Claim of ATKN California against ATKN Nevada and the Claim of ATKN Nevada against ATKN California.

1.18   "ATKN Nevada" means ATKN Company, formerly known as Guy F. Atkinson Company, a Nevada corporation

EXHIBIT___B___
Page___6___ of ___66___ Pages

1.19   "ATKN Pension Plan" means the Atkinson 1987 Pension Plan, currently administered by the PBGC as the statutory trustee of the ATKN Pension Plan.

1.20   "Auditor Litigation" means the claims for relief asserted by the Debtors and the Holdings Trust in the action entitled *Guy F. Atkinson Company of California, et al. v. PriceWaterhouseCoopers, LLP, et al.*, Case No. C 99-4334 (CRB), presently pending in the United States District Court for the Northern District of California.

1.21   "Avoidance Litigation" means all claims or causes of action of the Debtors, the Holdings Trust, CAPC or the CAPC Receiver, as the case may be, under Subchapter III of Chapter 5 of the Bankruptcy Code or other applicable avoidance law, which have been or may hereafter be commenced by the Debtors, the Holdings Trust, CAPC or the CAPC Receiver including, but not limited to, all actions (i) to avoid and recover any transfers of property determined to be preferential or fraudulent pursuant to Sections 544, 545, 547, 548, 549(a) and 550 of the Bankruptcy Code, (ii) to avoid and recover any transfers of property determined to be a transfer at an undervalue or an unfair preference under the laws of the Republic of Singapore, (iii) for the turnover of property to the Debtors, the Holdings Trust, CAPC or the CAPC Receiver, or (iv) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors, the Holdings Trust, CAPC or the CAPC Receiver, provided that, Avoidance Litigation does not include the Bonded Project Avoidance Actions, the Kiani Claim or any actions against the Banks or the Bonding Companies.

1.22   "Avoidance Litigation Recovery" means any Cash or other property or proceeds received by the Debtors, the Holdings Trust or CAPC under all or any portion of the Avoidance Litigation including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or other disposition of all or any portion of the Avoidance Litigation.

1.23   "Ballot" means the form for (i) acceptance or rejection of the Plan distributed to those Creditors entitled to vote on the Plan, and (ii) the election of the Allowed Convenience Claim option, as such form may be approved by the Bankruptcy Court and shall otherwise comply with the requirements of Bankruptcy Rule 3018(c). For purposes of this Plan, Ballot shall also include any voting instructions and other information that the Debtors are authorized to disseminate to Creditors under Bankruptcy Rule 3017(d)(4).

1.24   "Bank Cash Collateral Orders" means the *Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection* filed on August 13, 1997, the *Second Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection* filed on August 25, 1997, the *Third Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection* filed on October 23, 1997, along with six orders extending that order and filed, respectively, on January 23, February 13, March 12, April 30, May 22, and July 2, 1998, the *Fourth Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection* filed on July 27, 1998, the *Fifth Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection* filed on March 31, 1999, the *Sixth Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection* filed on September 30, 1999, and any future orders authorizing cash collateral.

1.25   "Bank Claim" means (X) in the aggregate, all Claims held or asserted by the Banks against the Debtors, the Holdings Trust, CAPC, or any Affiliates including, but not limited to, Claims under or related to (i) the Bank Credit Agreement, (ii) the Bank Cash Collateral Orders, (iii) the Bank LC, (iv) the DIP Loan Orders, (v) Sections 507(b) or 503 of the Bankruptcy Code, (vi) any proofs of Claim filed by the Banks in any of the Atkinson Cases, (vii) any claims asserted by the Banks in the CAPC Receivership, (viii) the Yale Funds, and (ix) the interest, fees, costs or charges allowed to the Banks on their Claims, and (Y) the Bank Third Party Claims.

1.26   "Bank Credit Agreement" means the *Credit Agreement* among the Debtors, Holdings, and the Banks, dated as of September 29, 1995, as amended, modified or supplemented from time to time, and all related notes, security and pledge agreements, and other ancillary documents executed in connection therewith.

1.27   "Bank LC" means *Letter of Credit Number NAS212424* issued by the Banks for the benefit of Employers Insurance of Wausau (together with its successors and assigns).

1.28   "Bank LC Debt" means the (i) the aggregate principal amount available to be drawn under the Bank LC as of the Effective Date, and (ii) all letter of credit fees permitted under § 2.6(b) of the Bank Credit Agreement.

1.29   "Bank LC Put Agreement" means the Plan Agreement under which the Bonding Companies shall, from time to time, purchase the Bank LC Debt from the Banks, substantially in the form annexed to the Disclosure Statement as an Exhibit or to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing, as such documents may be modified, amended or supplemented from time to time.

1.30   "Bank Loan Debt" means the aggregate amount of (x) the unpaid principal amount due under the Bank Credit Agreement (to the extent reduced by the $7,455,321.70 paid by the Bonding Companies on or about February 8, 2000), and (y) the unpaid interest accrued under, and professional fees and expenses billed pursuant to, the Bank Credit Agreement, provided that, (i) the interest allowed to the Banks on such claim for the period from February 1, 2000, through the Effective Date shall be calculated under the rate set forth in § 2.6(a) of the Bank Credit Agreement, (ii) the fees, costs or charges allowed to the Banks on such claim accrued for the period from February 9, 2000, through the Effective Date shall not exceed $100,000, (iii) the unpaid principal amount due under the Bank Credit Agreement as of February 9, 2000, shall not exceed that certain amount specified by the Banks to the Bonding Companies in a Plan Agreement, and (iv) the Bank LC Debt shall not be included in the Bank Loan Debt.

1.31   "Bank Third Party Claims" means all Claims of the Banks based on the Bank Claim against persons *other than* the Debtors, Holdings Trust, CAPC, the CAPC Receivership or Affiliates.

1.32   "Bankruptcy Code" means Title 11 of the United States Code, §§ 101 et seq., as in effect on the Effective Date, as the same thereafter has been and may be amended.

1.33   "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of California or such other court as may hereafter exercise jurisdiction over the Chapter 11 Cases.

1.34   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as in effect on the Effective Date, as the same thereafter have been and may be amended, and the Local Rules of the Bankruptcy Court to the extent applicable to the Chapter 11 Cases.

1.35   "Banks" means Wells Fargo Bank, N.A., for itself and as Agent, Bear Stearns & Co., and Cerberus Partners LP, together with their predecessors, successors and assigns

1.36   "BC Bank Claim" means the Allowed Secured Claim granted to the Bonding Companies under Section 5.1 of the Plan

1.37   "BC Fixed Claim" means the Allowed Unsecured Claim granted to the Bonding Companies under Section 5 4 of the Plan

1.38 "Bonded Project Avoidance Actions" means those adversary proceedings which have been designated by the Bonding Companies, in their sole discretion, in a Plan Agreement filed on or before the date of the Confirmation Hearing.

1.39 "Bonding Companies" means F&D and AIG.

1.40 ."Bonding Companies' Indemnity Agreements" means the indemnity agreements entered into before the Filing Date among the Debtors and F&D, and the Debtors and AIG.

1.41 "Bonding Companies' Secured Claim" means, in the aggregate, any and all Allowed Secured Claims held or asserted by the Bonding Companies against the Debtors, the Holdings Trust, CAPC or any Affiliates including, but not limited to, Claims under or related to (i) the DIP Loans, the DIP Credit Agreement or the DIP Loan Orders, (ii) the Bonding Companies' Indemnity Agreements, (iii) the Bonding Companies' Surety Bonds, or (iv) any proofs of Claim filed by the Bonding Companies in any of the Atkinson Cases.

1.42 "Bonding Companies' Surety Bonds" means the surety bonds, undertakings or instruments of guarantee issued by either of the Bonding Companies on behalf of the Debtors under the Bonding Companies' Indemnity Agreements.

1.43 "Bonding Companies' Unsecured Claim" means, in the aggregate, any and all Allowed Unsecured Claims held or asserted by the Bonding Companies against the Debtors, the Holdings Trust, CAPC or any Affiliates including, but not limited to, Claims under or related to (i) the DIP Loans, the DIP Credit Agreement or the DIP Loan Orders, (ii) the Bonding Companies' Indemnity Agreements, (iii) the Bonding Companies' Surety Bonds, or (iv) any proofs of Claim filed by the Bonding Companies in any of the Atkinson Cases

1.44 "Books and Records" means all business and financial records or documents, in any form or on any medium, created by the Debtors, Holdings Trust or CAPC including, without limitation, microfilm, microfiche and computer tapes on which accounting and other information systems data of the Debtors may be stored.

1.45 "Books and Records Agreement" means the Plan Agreement among the Responsible Officer, the Committee and the Bonding Companies specifying the (a) Books and Records that shall be delivered or retained, respectively, with the Transferred Assets or the Retained Assets (b) access, storage and expense sharing arrangements for any Books and Records that are of mutual relevance to the Transferred Assets and the Retained Assets, (c) access, storage and expense sharing arrangements for any Books and Records that are inadvertently not delivered or retained as anticipated under subpart (a) of this definition, (d) retention and disposal procedures and expense sharing for any Books and Records, and (e) further provisions that may be necessary or appropriate to obtain access to or possession of any Books and Records, substantially in the form to be filed with the Bankruptcy Court on or before the Confirmation Date, as such agreement may be modified, amended or supplemented from time to time.

1.46 "Business Day" means any day other than a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

1.47 "CAPC" means Commonwealth Asia Pacific Constructors Pte. Ltd., a Singapore corporation, and a debtor and debtor in possession in Chapter 11 Case No. 98-32011-TC presently pending in the Bankruptcy Court.

1.48 "CAPC Cash" means the Cash owned by CAPC in the CAPC Chapter 11 Case.

EXHIBIT B

Page ___ of 46 Pages

1   1.49  "CAPC Chapter 11 Case" means the Chapter 11 case for CAPC in the Bankruptcy Court under case number 98-32011-TC.

2

3   1.50  "CAPC Receiver" means the Official Receiver appointed by the Government of Singapore in the CAPC Receivership.

4   1.51  "CAPC Receivership" means the foreign proceeding for CAPC in Singapore, entitled *Commonwealth Asia Pacific Constructors Pte. Ltd., in Companies Winding Up No 1919*

5   *of 1998.*

6   1.52  "Cash" means cash and cash equivalents including, but not limited to, checks, wire transfers, money orders, certificates of deposit and other similar, readily marketable

7   securities or instruments, together with any interest earned or accrued thereon.

8   1.53  "Chapter 11 Cases" means the Chapter 11 cases for ATKN California and ATKN Nevada that have been jointly administered in the Bankruptcy Court under case number 97-

9   33694-TC.

10   1.54  "Claim" means a claim within the meaning of Section 101(5) of the Bankruptcy Code against (i) either or both of the Debtors, or (ii) where the context requires, any other

11   entity in connection with the Atkinson Cases

12   1.55  "Claims Reserve Account" means the reserve account to be established and held in trust by the Disbursing Agent on or after the Effective Date for the purpose of holding the

13   Cash to be distributed under the Plan and any interest, dividends or other income earned upon the investment of such Claims Reserve Account.

14

15   1.56  "Class" means a category or group of Creditors which are substantially similar to the Claims of the other Creditors in such Class, as designated by the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

16

17   1.57  "Class 7 Proceeds" means all Net Plan Proceeds after the deduction of amounts to be distributed by the Disbursing Agent, or deposited to or withheld in the Claims Reserve Account on account of or in anticipation of distributions, pursuant to this Plan to (i) the holders

18   of Administrative Claims, (ii) the holders of Priority Tax Claims, (iii) the holders of Priority Employee Claims, (iv) the holders of Allowed Secured Claims, and (v) the holders of Allowed

19   Convenience Claims.

20   1.58  "Colma" means Colma Casualty Company, an Affiliate of ATKN California.

21   1.59  "Colma Distribution" means any distributions made by Colma to ATKN California following the windup and dissolution of Colma under applicable law.

22

23   1.60  "Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 case of ATKN Nevada as it may be constituted from time to time.

24   1.61  "Confirmation" means entry of the Confirmation Order.

25   1.62  "Confirmation Date" means the date upon which the Confirmation Order is entered on the docket by the clerk of the Bankruptcy Court pursuant to Bankruptcy Rules 5003

26   and 9021.

27   1.63  "Confirmation Findings" means the findings of fact and conclusions of law set forth in the Confirmation Order confirming, substantially in the following form, that (i) the

28   Bonding Companies are authorized and empowered to serve as a representative of the estate of

AMENDED JOINT PLAN OF REORGANIZATION

EXHIBIT **B**
Page **10** of **46** Pages

1   ATKN Nevada under § 1123(b)(5) of the Bankruptcy Code for the purpose of pursuing
    recoveries on any of the Transferred Assets, (ii) there are adequate circumstances, and sufficient
2   benefits to Creditors, to substantively consolidate the affairs of the Debtors; and (iii) all
    Intercreditor Appeals and Intercreditor Litigation shall be released and dismissed.

3
            1.64    "Confirmation Hearing" means the duly noticed hearing held by the Bankruptcy
4   Court on confirmation of the Plan pursuant to Section 1128 of the Bankruptcy Code.  The
    Confirmation Hearing may be adjourned by the Bankruptcy Court from time to time without
5   further notice other than the announcement of the adjourned date at the Confirmation Hearing.

6.          1.65    "Confirmation Order" means the order of the Bankruptcy Court confirming the
    Plan pursuant to Section 1129 of the Bankruptcy Code, containing terms acceptable in form and
7   substance to the Debtors, the Committee, the Bonding Companies and the Banks.

8           1.66    "Contingent Claim" means any Claim for which a proof of Claim has been filed
    with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been
9   estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date.

10          1.67    "Convenience Claim Overage" means the amount, if any, in excess of $500,000
    that is distributed in the aggregate to the holders of Allowed Convenience Claims under Sections
11  2.2(f), 4.6 and 5.28 of the Plan.

12          1.68    "Creditor" means any entity that holds a Claim that arose or is deemed to have
    arisen at the time of or before the Filing Date.
13
            1.69    "D&O Counsel" means Goodin, MacBride, Squeri, Ritchie & Day LLP.
14
            1.70    "D&O Litigation" means the claims for relief asserted, respectively, by the
15  Debtors, the Banks, the Bonding Companies, AICCO, Dillingham Construction N.A., Inc., and
    The Lane Construction Corporation against certain former officers and directors of the Debtors
16  and Holdings in various state and federal actions, including actions (i) related to the action
    pending in the United States District Court for the Northern District of California in Case No.
17  C 99-4334 (CRB), entitled *Guy F. Atkinson Company of California, et al. v.
    PriceWaterhouseCoopers, LLP, et al.*, (ii) pending in the Superior Court for the County of
18  Contra Costa in Case No. C99 02332, and (iii) pending in the United States District Court for
    the Northern District of California in Case No. C-99-3605 (PJH).
19
            1.71    "D&O Litigation Proceeds" means the amounts payable under the D&O
20  Settlement, or any other Proceeds from the D&O Litigation.

21          1.72    "D&O Retention" means the terms and conditions under which the Debtors
    retained D&O Counsel to prosecute the D&O Litigation, and the Auditor Litigation, as
22  approved by the Bankruptcy Court pursuant to an order entered on December 1, 1999.

23          1.73    "D&O Settlement" means the compromise set forth in that certain *Settlement
    Agreement and Mutual Release* to be entered into among the parties to, or involved with, the
24  D&O Litigation.

25          1.74    "D&O Settlement Conditions" means the terms and conditions under which the
    D&O Settlement will be acceptable to the Debtors, the Reorganized Debtor, the Committee and
26  D&O Counsel, as set forth in a confidential Plan Agreement.

27          1 75    "Debt" means liability on a Claim.

28          1.76    "Debtors" means ATKN California and ATKN Nevada.

1   1.77   "Debtors' Charters" means the articles or certificate of incorporation and the
bylaws of ATKN California and ATKN Nevada, respectively, and any amendments to the
2   foregoing.

3   1.78   "DIP Credit Agreement" means the *Debtor in Possession Credit Agreement*
among the Debtors, Holdings, and the Bonding Companies, dated as of September 8, 1997, as
4   amended, modified or supplemented from time to time.

5   1.79   "DIP Loan Orders" means the *Interim Order Authorizing DIP Financing from*
*Bonding Companies and Granting Liens and Priorities* filed August 25, 1997, the *Second*
6   *Interim Order Authorizing DIP Financing from Bonding Companies and Granting Liens and*
*Priorities* filed September 19, 1997, and the *Third Interim Order Authorizing DIP Financing*
7   *from Bonding Companies and Granting Liens and Priorities* filed October 23, 1997.

8   1.80   "DIP Loans" means the loans by the Bonding Companies to the Debtors under
the DIP Credit Agreement and the DIP Loan Orders.
9

10   1.81   "Disbursing Agent" means (i) the Reorganized Debtor, and (ii) such other person
or persons designated to act as, or assist, the disbursing agent under the Plan for the purpose of
making the distributions required under the Plan.
11

12   1.82   "Disclosure Statement" means the disclosure statement respecting the Plan filed
by the Debtors in the Chapter 11 Cases and approved by order of the Bankruptcy Court as
containing adequate information in accordance with Section 1125 of the Bankruptcy Code, as
13   such Disclosure Statement may be modified, amended or supplemented from time to time

14   1.83   "Disputed Claim" means (i) any Claim or portion of a Claim as to which an
objection to the allowance thereof has been interposed as of the Effective Date or any later
15   deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not
been withdrawn or determined by Final Order as of the Effective Date, (ii) any Claim for which
16   a proof of Claim is filed after the First or Second Bar Date, as applicable, or (iii) any
Contingent Claim.  To the extent an objection relates to the allowance of only a part of a
17   Claim, such Claim shall be a Disputed Claim only to the extent of the objection.  Moreover,
prior to the time that an objection has been or may be timely filed, for purposes of this Plan, a
18   Claim shall be considered a Disputed Claim to the extent that (i) the amount of the Claim
specified in the proof of Claim exceeds the amount scheduled by the Debtors in the Schedules
19   as other than disputed, contingent or unliquidated, (ii) the classification of the Claim specified in
the proof of Claim differs from the classification scheduled by the Debtors, (iii) the Claim was
20   scheduled as disputed, contingent or unliquidated, or (iv) the Claim was not scheduled by the
Debtors.
21

22   1.84   "Disputed Claims Amount" means the aggregate amount of Disputed Claims that
are fixed and absolute.  For purposes of calculating distributions of Cash under the Plan, the
23   amount of each Disputed Claim shall be based upon either (a) the face amount of such
Creditor's Disputed Claim as set forth in the Creditor's filed proof of Claim, or (b) the amount
at which the Bankruptcy Court may estimate such Disputed Claim.
24

25   1.85.   "Effective Date" means the Business Day on which the condition precedent to
consummation of the Plan specified in Section 8.1(a) of the Plan is satisfied, provided that, all
26   other conditions specified in Article 8 of the Plan have been satisfied or duly waived.

27

28

AMENDED JOINT PLAN OF REORGANIZATION

EXHIBIT ___B___
Page __12__ of __46__ Pages

1.86  "Employee Benefit Programs" means all health, dental, flexible medical payment, pension, welfare and retirement plans, and life and disability insurance policies, established by the Debtors for the benefit of their employees, whether or not such plans or programs were or had been terminated according to their terms before the Filing Date or during the Chapter 11 Cases, provided that, Employee Benefit Programs shall not include the ATKN Pension Plan

1.87  "Employee Retention Program" means the employee retention plan, any payments made thereunder, and all related terms and conditions, established by the Debtors and approved pursuant to the *Order Authorizing Employee Retention Program*, entered by the Bankruptcy Court on November 25, 1997.

1.88  "Estate" means the estate created for each of the Debtors under Section 541 of the Bankruptcy Code upon the commencement of their respective Chapter 11 Cases.

1.89  "Estate Cash" means (i) all Cash owned by the Debtors (including the Yale Funds) on the Effective Date, together with all interest earned and Proceeds received on such cash for the period from February 9, 2000, through the Effective Date, *less* the Starting Cash, (ii) the Holdings Trust Cash, and (iii) the CAPC Cash, provided that, Estate Cash does not include the Third Party Cash or the Third Party JV Cash.

1.90  "F&D" means Fidelity & Deposit Company of Maryland, together with its successors and assigns.

1.91  "Filing Date" means August 10, 1997, the date upon which the Debtors filed their petitions pursuant to Chapter 11 of the Bankruptcy Code.

1.92  "Final Order" means an order or judgment of Bankruptcy Court or other court of competent jurisdiction (i) which has not been reversed, stayed, modified or amended, (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired), and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

1.93  "Final Resolution Date" means the date on which all Disputed Claims in each and every class shall have been resolved by Final Order or otherwise finally determined.

1.94  "First Bar Date" means December 15, 1997, the last date established by the First Bar Date Notice by which certain entities asserting a Claim against the Debtors must have filed a proof of Claim or be forever barred from asserting a Claim against the Debtors and from voting on the Plan and/or sharing in any distribution thereunder.

1.95  "First Bar Date Notice" means the *Notice of Deadline for Filing Proofs of Claim*, served by the Debtors on all Creditors on or about October 27, 1997.

1.96  "Governance Committee" means the committee (i) comprised of a member, representative or designee of the Bonding Companies (collectively) and the Committee, and (ii) formed to oversee the affairs of the Reorganized Debtor and advise and consult with the Responsible Officer following the Effective Date.

1.97  "Governance Committee Bylaws" means the Plan Agreement specifying, among other provisions, certain terms for the appointment, duties and compensation of the members of the Governance Committee and the conduct of the affairs of such committee and the Reorganized Debtor.

1    1.98   "Holdings" means ATKN Holdings, Ltd., formerly known as Guy F. Atkinson
     Holdings, Ltd., a Canadian federal corporation.
2
          1.99   "Holdings Beneficiary Committee" means the *Beneficiary Committee* defined
3    under the Holdings Trust Agreement.

4         1.100  "Holdings Cash" means the Cash owned by the Holdings Trust.

5         1.101  "Holdings Chapter 11 Case" means the Chapter 11 case for Holdings in the
     Bankruptcy Court under case number 97-33696-TC.
6
          1.102  "Holdings DIP Loans" means the loans made, from time to time, by Holdings
7    and the Holdings Trust to CAPC for the purpose, among others, of prosecuting the Kiani
     Claim.
8
          1.103  "Holdings Plan" means the *Second Amended Plan of Reorganization for ATKN*
9    *Holdings, Ltd. (December 20, 1999)*, that was confirmed by the Bankruptcy Court pursuant to
     an order entered on December 28, 1999, and that was substantially consummated on January 7,
10   2000.

11        1.104  "Holdings Trust" means the ATKN Holdings Liquidating Trust, established
     pursuant to the Holdings Plan.
12
          1.105  "Holdings Trust Agreement" means the *Liquidating Trust Agreement* for the
13   Holdings Trust.

14        1.106  "Holdings Trust Claims" means the *Assumed Claims* defined under the Holdings
     Trust Agreement.
15
          1.107  "Insider Action" means the adversary proceeding entitled *Complaint to Avoid and*
16   *Recover Prepetition Transfers (Certain Insiders)*, filed by the Committee and the Debtors on
     August 10, 1999, No. 99-3319 TC, against certain former officers and directors of the Debtors
17   to avoid and recover certain transfers.

18        1.108  "Insider Action Proceeds" means the $50,000 payment to be made by the
     Bonding Companies to the Debtors upon receipt by the Bonding Companies of the D&O
19   Proceeds.

20        1.109  "Intercreditor Appeals" means the appeals taken by one or more of the Debtors,
     the Banks, the Bonding Companies or the Committee from the relief granted in certain orders
21   entered by the Bankruptcy Court, as more particularly identified on Exhibit C of the Disclosure
     Statement.
22
          1.110  "Intercreditor Litigation" means the rights, claims and defenses among the
23   Debtors, the Banks, the Bonding Companies and the Committee asserted in certain contested
     matters and adversary proceedings, as more particularly identified on Exhibit C of the
24   Disclosure Statement.

25        1.111  "Interests" means the rights of the owners and holders of ATKN Equity
     Securities
26
          1.112  "Kiani Claim" means:
27
               1.   all Claims and causes of action of the Debtors, CAPC, the CAPC
28                  Receiver, the Holdings Trust, the Banks, or the Bonding Companies

AMENDED JOINT PLAN OF REORGANIZATION

EXHIBIT ___B___
Page __14__ of __46__ Pages

1    against Kiani Kertas, the Kiani Consortium (and its individual members), and any related entities, including, but not limited to those claims which
2    are the subject of (X) International Chamber of Commerce Arbitration No.10518/OL, (Y) the adversary proceeding entitled *Complaint for Breach*
3    *of Contract, Interference with Contract, et seq.*, filed by Holdings, CAPC and the Banks on May 8, 1998, No. 98-3128 TC, presently pending in the
4    Bankruptcy Court, and (Z) the proofs of claim filed by CAPC and the Banks in the Chapter 11 case of Beloit Corporation presently pending in
5    the United States Bankruptcy Court for the District of Delaware, No. 99-02177;

6

7    2.    all claims, rights and interests of the Debtors, the Holdings Trust, the Banks or the Bonding Companies which may be asserted in the CAPC
8    Receivership; and

9    3.    all litigation now or hereafter asserted against Kiani Kertas, the Kiani Consortium or any related entity.

10    1.113  "Kiani Consortium" means the Southeast Asia Project Consortium, a joint venture or other legal entity formed to render engineering and procurement services in connection with
11    the Kiani Project and comprised of A. Ahlstrom Corporation, Beloit Corporation, Simons Pacific Constructors, Pte. Ltd., and/or their respective affiliates.

12

13    1.114  "Kiani Kertas" means PT. Kiani Kertas, an Indonesian corporation.

14    1.115  "Kiani Project" means the construction project to engineer, procure and build a pulp mill in Kalimantan Timur, Indonesia for Kiani Kertas.

15    1.116  "Kiani Related Liens" means all liens, security interests, mortgages, pledges, charges or any other encumbrances held by (or in favor of) the Banks, the Bonding Companies,
16    the Holdings Trust or the Debtors in, against, or on account of (a) the Kiani Claim, (b) the Holdings DIP Loans, and (c) any rights, claims or assets of the Holdings Trust

17

18    1.117  "Net Plan Proceeds" means all Retained Asset Proceeds after the deduction of amounts to be paid, or deposited to or withheld in the Claims Reserve Account on account of or
19    in anticipation of payments, for Reorganized Debtor Expenses.

20    1.118  "PBGC" means the Pension Benefit Guaranty Corporation.

21    1.119  "Permitted Payments" means all amounts paid by the Debtors, Holdings or CAPC during their respective Chapter 11 cases on account of Claims arising prior to the Filing Date in
22    the amounts and according to the conditions set forth in the (i) *Order Authorizing Debtors to (1) Pay Prepetition Employee Compensation, Related Taxes and Benefits and (2) Reimburse*
23    *Employee Business Expenses*, entered by the Bankruptcy Court on August 13, 1997, (ii) *Order Authorizing Payment of Certain Prepetition Workers' Compensation Claims*, entered by the
24    Bankruptcy Court on August 15, 1997, (iii) to the extent applicable, the Bank Cash Collateral Orders and the DIP Loan Orders, (iv) Order Authorizing Debtors and Debtors in Possession to
25    Pay Certain Prepetition Unsecured Creditors of Guy F. Atkinson Holdings, Ltd., entered by the Bankruptcy Court on October 23, 1997, (v) letter agreement dated October 21, 1997, among the
26    Debtors, CAPC and the Banks under which certain CAPC claimants received a distribution from the proceeds of certain equipment auctions by CAPC, and (vi) Employee Retention
27    Program

28

EXHIBIT  B

Page 15 of 46 Pages

1.120  "Plan" means this Chapter 11 plan of reorganization and any exhibits and schedules hereto and any documents incorporated herein by reference, as the same may from time to time be amended or modified as and to the extent permitted herein or by the Bankruptcy Code.

1.121  "Plan Agreement(s)" means all releases, assignments, and other instruments which are (a) necessary or appropriate to (X) effect the transfer to the Bonding Companies of the Transferred Assets, (Y) effect the purchase of the Bank Claim by the Bonding Companies, including the Bank LC Put Agreement, and (Z) fulfill any other act that is required to consummate the Plan, (b) otherwise requested by the Bonding Companies, the Banks, the Debtors or the Committee to carry out any transactions contemplated by the AIP, and (c) otherwise identified as *Plan Agreements*, substantially in the form annexed to the Disclosure Statement as an Exhibit or to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing, as such documents may be modified, amended or supplemented from time to time.

1.122  "Plan Payments" means all amounts to be paid by the Debtors or by any person for services or expenses in the Chapter 11 Cases or incident to the Plan pursuant to Section 1129(a)(4) of the Bankruptcy Code.

1.123  "Priority Employee Claim" means that portion of an Allowed Unsecured Claim, if any, entitled to priority in payment under Sections 507(a)(3) and 507(a)(4) of the Bankruptcy Code.

1.124  "Priority Tax Claim" means that portion of a Tax Claim, if any, entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

1.125  "Proceeds" means all Cash, interest, profits, dividends, proceeds, products, and rents earned, accrued, collected, derived, received or recovered on account of the liquidation, sale, transfer, enforcement or other disposition of property, including all "proceeds" as defined under Section 9306 of the California Uniform Commercial Code.

1.126  "Professionals" means those attorneys, accountants or other professional persons employed by the Debtors, the Committee and the Responsible Officer in the Chapter 11 Cases and to be compensated for services rendered and reimbursed for expenses incurred pursuant to Section 503(b) of the Bankruptcy Code.

1.127  "Professional Fees" means all amounts allowed and awarded by the Bankruptcy Court for compensation for services rendered and reimbursement of expenses incurred by Professionals pursuant to Section 503(b) of the Bankruptcy Code.

1.128  "Pro Rata" means proportionately so that the ratio of (a) the amount distributed on account of an Allowed Claim in a particular Class to (b) the amount of the Allowed Claim is the same as the ratio of (x) the aggregate amount distributed on account of all Allowed Claims in that Class to (y) the aggregate amount of all Allowed Claims in that Class.

1.129  "Reorganization Law" means (i) with respect to ATKN California, Sections 303 *et seq.* of the Delaware General Corporation Law, and (ii) with respect to ATKN Nevada, Sections 78.622 *et seq.* of Title 7 of the Nevada Revised Statutes.

1.130  "Reorganized Debtor" means the substantively consolidated Debtors which shall be revested with the Retained Assets on the Effective Date.

1.131  "Reorganized Debtor Budget" means the operating budget periodically adopted by the Reorganized Debtor, with the advice and consent of the Committee and the Bonding

EXHIBIT ___B___
Page __16__ of __46__ Pages

1   Companies, for the purpose of (i) marshaling and liquidating the Retained Assets for the benefit
    of Creditors, (ii) prosecuting or otherwise attempting to collect or realize upon the Retained
2   Assets, (iii) resolving Disputed Claims and effectuating distributions to Creditors under the
    Plan, and (iii) otherwise implementing the Plan, winding up the affairs of the Debtors, Holdings
3   Trust, CAPC and Affiliates and closing the Atkinson Cases.

4        1.132 "Reorganized Debtor Expenses" means the expenses incurred by the Reorganized
    Debtor or the Disbursing Agent after the Effective Date (including the fees and costs of
5   attorneys and other professionals) pursuant to the Reorganized Debtor Budget.

6        1.133 "Responsible Officer" means E. Lawrence Hill, Jr., in his capacity as the
    Responsible Officer of the Debtors or the Reorganized Debtor, or his successor in that capacity.
7

8        1.134 "Responsible Officer Creditor Engagement" means the Plan Agreement to be
    entered into among the Responsible Officer, the Committee and the Bonding Companies
9   specifying mutually satisfactory terms for the (a) employment conditions of, and responsibilities
    assumed, by the Responsible Officer; (b) compensation for the Responsible Officer for services
10  rendered and expenses incurred following the Effective Date; (c) procedures for governance of
    the Reorganized Debtor by the Governance Committee; (d) procedures for selection of a
11  possible successor to the Responsible Officer; and (e) further provisions that may be necessary
    or appropriate to implement the Plan, substantially in the form to be filed with the Bankruptcy
12  Court on or before the Confirmation Date, as such agreement may be modified, amended or
    supplemented from time to time.

13       1.135 "Responsible Officer Debtor Engagement" means the *Retention Agreement for
    Employment of E. Lawrence Hill, Jr., as Responsible Officer*, dated as of March 27, 1998, as
14  subsequently amended.

15       1.136 "Responsible Officer Orders" means the (i) *Order Authorizing Employment of
    Responsible Officer*, entered by the Bankruptcy Court on February 13, 1998, and (ii) the various
16  orders of the Bankruptcy Court approving the Responsible Officer Debtor Engagement, entered
    on March 27, 1998, April 30, 1998, and July 24, 1998.
17
18       1.137 "Retained Assets" means the following assets and property retained by the
    Debtors:

19           1.      the Starting Cash;

20           2.      the Avoidance Litigation;

21           3.      the Insider Action Proceeds;

22           4.      the Auditor Litigation;

23           5.      50% of the Solar Tax Recovery Surplus;

24           6.      all motor vehicles and Turlock, Riverside and San Jose real property of
                     the Debtors or the Holdings Trust (i) on which the Banks did not hold
25                   perfected liens as of the Filing Date, and (ii) which had not been
                     liquidated as of January 31, 2000;
26
             7.      all capital stock, claims of the Debtors against, and all present and future
27                   property, rights and interests of Affiliates;

28

EXHIBIT ___B___
Page___17___of_46_Pages

8.     the Kiani Claim, the Kiani Related Liens, and the stock of CAPC owned by Holdings Trust (as the same may be exercised by the Debtors' beneficial interests in the Holdings Trust); and -

9.     all Retained Asset Proceeds arising on and after February 9, 2000.

1.138 "Retained Asset Proceeds" means all Proceeds of the Retained Assets, including the Avoidance Litigation Recoveries.

1.139 "RO Incentive Compensation" means the compensation payable as an Administrative Claim from the Retained Assets to the Responsible Officer (i) under the Responsible Officer Debtor Engagement on account of the dispositions of property of the Debtors' Estates contemplated under this Plan, or (ii) as may otherwise be agreed by the Responsible Officer, the Committee and the Bonding Companies.

1.140 "Schedules" means the schedules and statements filed by the Debtors on October 2, 1997, pursuant to Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as further amended from time to time.

1.141 "Scheduling Order" means the *Order Shortening Time for Notices and Fixing Hearing Dates on Disclosure Statement and Plan of Reorganization*, entered by the Bankruptcy Court on February 16, 2000, scheduling, <u>inter alia</u>, the Confirmation Hearing and the Voting Deadline.

1.142 "Second Bar Date" means March 23, 2000, the last date established under the Second Bar Date Order by which certain entities asserting a Claim against the Debtors must have filed a proof of Claim or be forever barred from asserting a Claim against the Debtors and from voting on the Plan and/or sharing in any distribution thereunder.

1.143 "Second Bar Date Order" means the *Order (1) Approving Disclosure Statement, (2) Setting Balloting Procedures, (3) Setting Claims Bar Dates, and (4) Establishing Related Confirmation Procedures*, entered by the Bankruptcy Court on February 25, 2000.

1.144 "Service List (Plan)" means the *Plan Notifications List* attached as Exhibit A to the Scheduling Order.

1.145 "Service List (Special)" means the list of persons who have filed and served a request for special notice pursuant to the *Order Amending Notice Procedures and Case Management Order*, entered by the Bankruptcy Court on October 25, 1999.

1.146 "Service List (New)" means the persons on the Service List (Special) and any other persons who elect, pursuant to such procedures as may be established in the Confirmation Order or other order of the Bankruptcy Court, to receive notice from the Reorganized Debtor following the Effective Date.

1.147 "Solar Tax Counsel" means Brobeck, Phleger & Harrison LLP.

1.148 "Solar Tax Counsel Agreement" means the *Engagement Agreement for Tax Appeal and Related Issues*, dated May 12, 1999, among the Debtors and Solar Tax Counsel.

1.149 "Solar Tax Litigation" means the action and related appeal concerning the pursuit of an income tax refund on behalf of the Debtors from the Franchise Tax Board based on a certain solar energy tax credit.

EXHIBIT ___B___
Page __18__ of __46__ Pages

1.150  "Solar Tax Recovery" means any Cash or other property received by the Debtors under the Solar Tax Litigation including, but not limited to, awards of damages, attorneys' fees and expenses, interest and statutory costs, whether recovered by way of settlement, execution on judgment or otherwise.

1.151  "Solar Tax Recovery Surplus" means the Solar Tax Recovery *less* amounts payable to Solar Tax Counsel under the Solar Tax Counsel Agreement.

1.152  "Starting Cash" means $6,500,000 *less* all disbursements made by the Debtors on and after February 9, 2000, through and including the Effective Date for (i) any accrued (but otherwise unpaid as of February 9, 2000) Professional Fees, Administrative Claims and operating expenses of the Debtors, and (ii) any Professional Fees, Administrative Claims and operating expenses incurred on and after February 9, 2000, of the Debtors or the Reorganized Debtor, provided that, Starting Cash does not include the Third Party Cash or the Third Party JV Cash.

1.153  "Stock Rescission or Damage Claim" means any Claim (i) for rescission of the purchase or sale of ATKN Equity Securities, (ii) for damages arising from the purchase or sale of ATKN Equity Securities, or (iii) for reimbursement, contribution or indemnification on account of such rescission or damage Claim.

1.154  "Subordinated Claim" means any Claim (a) subordinated for purposes of distribution pursuant to Section 510(c) of the Bankruptcy Code, or (b) for any fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, to the extent that such Claims are not compensation for actual pecuniary loss, provided that, Subordinated Claim does not include any Claim subordinated only pursuant to Section 5.13 of the Plan.

1.155  "Tax Claim" means all or that portion of an Allowed Claim held by a governmental unit for a tax assessed or assessable against the Debtors, including income and employment taxes and any related penalties or interest.

1.156  "Third Party Cash " means the Cash held by the Debtors as a custodian under escrow arrangements for the benefit of (i) VECO, in connection with the Holdings Plan, (ii) State of Connecticut taxing authorities, in connection with the Trumbull Sale, and (iii) other non-Debtor entities, such as the State of Louisiana in connection with the Shreveport environmental remediation claims.

1.157  "Third Party JV Cash" means the Cash held by the Debtors as a custodian for joint ventures.

1.158  "Transferred Assets" means (i) the Estate Cash, (ii) the Transferred Asset Recoveries, (iii) all other assets and property of the Debtors, the Holdings Trust and CAPC *except and excluding* the Retained Assets, and (iv) all Transferred Asset Proceeds arising on and after February 9, 2000 (unless applied prior to the Effective Date to reduce the Bank Claim in accordance with the Bank Cash Collateral Orders).

1.159  "Transferred Asset Proceeds" means all Proceeds of the Transferred Assets.

1.160  "Transferred Asset Recoveries" means Proceeds received or recovered from the non-debtor parties to any executory contracts or unexpired leases rejected under Section 6.1(b) of the Plan, but only to the extent such agreements do *not* relate to the Retained Assets

EXHIBIT  B
Page 19 of 46 Pages

1.161 "Trumbull Sale" means the sale of the Debtors' real property located in Trumbull, Connecticut, pursuant to the *Order Authorizing Sale of Real Property Free and Clear of Liens, Claims, Rights and Interests (Trumbull, Connecticut)*, entered by the Bankruptcy Court on December 27, 1999.

1.162 "Trust Fund Tax Claim" means that portion of any Tax Claim attributable to taxes (a) considered to be held in trust for the governmental unit under applicable nonbankruptcy law; (b) of a type for which the directors, officers or employees of a taxpayer may be personally liable to such governmental unit under Section 6672 of the Internal Revenue Code of 1986, as amended, or any comparable provisions under applicable state laws, or (c) otherwise required to be collected or withheld by the Debtors on behalf of others.

1.163 "Unsecured Deficiency Claim" means any portion of a Claim to the extent that (i) the value of the Creditor's interest in the property of the Debtors securing such Claim is less than the amount of such Claim, or (ii) the amount of such Claim subject to setoff under Section 553 of the Bankruptcy Code is less than the amount of such claim, as determined pursuant to Section 506(a) of the Bankruptcy Code.

1.164 "VECO" means the entities defined in the Holdings Plan.

1.165 "Voting Deadline" means the deadline for filing Ballots to accept or reject the Plan and elect the Administrative Convenience Claim option, as fixed by the Bankruptcy Court in the *Order (1) Approving Disclosure Statement, (2) Setting Balloting Procedures, (3) Setting Claims Bar Dates, and (4) Establishing Related Confirmation Procedures*, entered by the Bankruptcy Court on February 25, 2000.

1.166 "Yale" means Yale University.

1.167 "Yale Claim" means (i) the rights and remedies asserted by Yale in the Yale Resulting Trust Litigation and the Yale Recoupment Litigation, (ii) the rights of Yale under any bond or undertaking given in connection with the Yale Resulting Trust Litigation, (iii) any Claims that Yale may hold under the Bank Cash Collateral Orders, the DIP Loan Orders or any stipulation approved by the Bankruptcy Court, and (iv) any proofs of Claim filed by Yale in any of the Atkinson Cases.

1.168 "Yale Funds" means (i) all Cash reserved, segregated or earmarked by the Debtors or Yale on account of or relating to the Yale Claim, and (ii) all of the Debtors' interest in the Yale job trust account established under certain stipulations among the Debtors and Yale.

1.169 "Yale Recoupment Litigation" means the claims for relief asserted by Yale in adversary proceeding number 98-3469 TC, filed on December 15, 1998, and any ensuing orders, judgments and appeals.

1.170 "Yale Resulting Trust Litigation" means the claims for relief asserted by Yale in adversary proceeding number 97-3549 TC, filed on September 4, 1997, and any ensuing orders, judgment and appeals

1.171 "Zurich" means Zurich American Insurance Company and American Guarantee and Liability Insurance Company.

1.172 "Zurich ADL Claim" means the Zurich Administrative Claim arising under the *ADL Policies*, as defined in the Zurich Agreement

1.173 "Zurich Administrative Claim" means the *Actual Administrative Expense* and the *Residual Administrative Expense*, as defined in the Zurich Agreement

EXHIBIT _____ B
Page 20 of 46 Pages

1.174  "Zurich Amendment" means the *Amendment to Zurich Insurance Claims Settlement*, dated March 24, 2000, among Zurich, the Debtors and the Committee.

1.175  "Zurich Agreement" means the *Zurich Insurance Claims Settlement*, dated November 4, 1999, among Zurich, the Debtors and the Committee, that was approved by the Bankruptcy Court pursuant to an order entered on January 28, 2000.

1.176  "Zurich Third Parties" means the third parties allegedly responsible under the *ADL Policies*, as defined in the Zurich Agreement.

## ARTICLE 2

## CLASSIFICATION OF CLAIMS

2.1  Criterion of Class.  The following is a designation of Classes of Claims under the Plan.  Administrative Claims and Priority Tax Claims have not been classified and are excluded from the following Classes in accordance with Section 1123(a)(1) of the Bankruptcy Code.  A Claim is classified in a particular Class only to the extent that (i) the Claim qualifies within the description of that Class and is classified in a different Class to the extent that the remainder of the Claim qualifies within the description of that different Class, and (ii) the Claim, or any portion or allowed amount of such Claim, is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.  In the event of a controversy as to whether (a) any Class of Claims is impaired, or (b) any Class of Claims is properly designated, the Bankruptcy Court shall, after notice and a hearing, determine such controversy pursuant to applicable provisions of the Bankruptcy Code and Bankruptcy Rule 3013.

2.2  Classes of Claims.  All Claims are divided into the following Classes, which Classes shall be mutually exclusive:

(a)  Class 1 Claim   Class 1 shall consist of the BC Bank Claim.

(b)  Class 2 Claim.  Class 2 shall consist of the Bonding Companies' Secured Claim.

(c)  Class 3 Claims.  Class 3 shall consist of all Allowed Secured Claims not otherwise classified in any other Class *but only* to the extent the holder of such claim has an interest in the Retained Assets Class 3 shall not include the Yale Claim.  Each holder of an Allowed Secured Claim in Class 3 shall be considered to be in its own separate subclass within Class 3, and each such subclass will be deemed to be a separate Class for purposes of this Plan.

(d)  Class 4 Claims.  Class 4 shall consist of the Yale Claim

(e)  Class 5 Claims.  Class 5 shall consist of all Priority Employee Claims

(f)  Class 6 Claims.  Class 6 shall consist of all Allowed Convenience Claims.

(g)  Class 7 Claims.  Class 7 shall consist of all Allowed Unsecured Claims not otherwise classified in Class 6, and shall include the BC Fixed Claim

(h)  Class 8 Claims.  Class 8 shall consist of all Subordinated Claims

AMENDED JOINT PLAN OF REORGANIZATION

EXHIBIT  B
Page 21 of 46 Pages

(i)   <u>Class 9 Interests and Claims</u>.  Class 9 shall consist of (i) all Interests, and (ii) all Stock Rescission or Damage Claims.

2.3  <u>Special Voting Provision</u>.  Solely for the purposes of accepting or rejecting this Plan, the Banks, as the holders of the Bank Claim, shall be deemed the holders of the Claim classified in Class 1 of the Plan and shall be entitled to vote such claim in their sole discretion, <u>provided that</u>, Class 1 shall be deemed to have accepted the Plan immediately prior to the Confirmation of the Plan in a manner consistent in all respects with the AIP.

## ARTICLE 3

## TREATMENT OF UNCLASSIFIED CLAIMS

3.1  <u>Administrative Claims</u>.  Each holder of an Administrative Claim shall receive, in exchange for and in full satisfaction of such Claim, Cash equal to the amount of such Claim, unless such holder shall have agreed to different treatment of such Claim: (a) as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or approving such Administrative Claim, (b) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Administrative Claims and the Debtors, or (c) with respect to Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan.

3.2  <u>Administrative Bar Date</u>.  All requests for payment of administrative expenses under Section 503(a) of the Bankruptcy Code that are subject to the Administrative Bar Date . Order must be filed and served (on the parties identified in the Service List (Plan)) on or before the Administrative Bar Date.  Any holder of such a Claim that is required under the Administrative Bar Date Order to file and serve a request for payment that fails to timely comply with the Administrative Bar Date shall be forever barred from asserting such Claim against the Debtors or any property of the Debtors and from sharing in any distribution under the Plan.  All objections, if any, to the allowance and approval of such Claims must be filed and served by 90 days after the Effective Date.  Holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtors' business following the Filing Date shall not be required to comply with the Administrative Bar Date, <u>provided that</u> (i) such holders have otherwise submitted an invoice, billing statement or other evidence of indebtedness to the Debtor in the ordinary course of business, and (ii) such Claims are not past due according to their terms.

3.3  <u>Other Administrative Claims</u>.  All requests for payment of administrative expenses under Section 503(a) of the Bankruptcy Code that are *not* subject to the Administrative Bar Date, including motions for approval of Plan Payments, motions for satisfaction of Assumption Obligations, and applications for the final allowance of Professional Fees for services rendered or expenses incurred on or before the Effective Date, must be filed and served (on the parties identified in the Service List (Plan)) not later than the first Business Day that is at least 60 days following the Effective Date.  Any holder of such a Claim that fails to timely file and serve a motion or other application shall be forever barred from asserting such Claim against the Debtors or any property of the Debtors and from sharing in any distribution under the Plan.  All objections, if any, to the allowance and approval of such Claims must be filed and served by 90 days after the Effective Date.

3.4  <u>Priority Tax Claims</u>.  Each holder of a Priority Tax Claim shall receive a Cash payment equal to the amount of such Claim, unless such holder shall have agreed to different treatment of such Claim, at the sole option of the Debtors: (a) as soon as practicable after the

EXHIBIT __B__
Page __22__ of __46__ Pages

later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable nonbankruptcy law or at a rate to be agreed to by the Debtors and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; provided, however, that the Reorganized Debtor may prepay any or all such Claims at any time, without premium or penalty; or (c) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtors. For the purpose of option (b), the payment of each Priority Tax Claim shall be made in equal quarterly installments with the first installment due on the latest of: (i) the first Business Day following the end of the first full calendar quarter following the Effective Date, (ii) the first Business Day following the end of the first full calendar quarter following the date an order allowing such Priority Tax Claim becomes a Final Order, and (iii) such other time or times as may be agreed with the holder of such Priority Tax Claim. Each installment shall include simple interest on the unpaid balance of the Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed or determined under option (b).

    3.5   Zurich Administrative Claim. The Zurich Administrative Claim shall be treated in accordance with the terms and conditions of the Zurich Agreement and the legal, equitable or contractual rights to which the holder of such Claim is entitled shall not be altered, except to the extent otherwise provided under the Zurich Amendment. The Debtors and the Committee reserve all rights against the Zurich Third Parties for contribution, reimbursement, indemnity or surcharge on account of the Zurich Administrative Claim.

    3.6   RO Incentive Compensation. The RO Incentive Compensation shall be disclosed and subject to the approval of the Bankruptcy Court as reasonable under the Responsible Officer Orders. The RO Incentive Compensation shall not exceed $500,000. The RO Incentive Compensation shall be paid by the Reorganized Debtor as soon as practicable following the Effective Date from the Retained Assets.

## ARTICLE 4

## TREATMENT OF CLASSIFIED CLAIMS

    4.1   Class 1 (BC Bank Claim). Class 1 Claims are impaired. On the Effective Date, the Bonding Companies shall receive, in exchange for and in full satisfaction of the BC Bank Claim, all right, title and interest in and to the Transferred Assets. Any remaining Unsecured Deficiency Claim on account of the BC Bank Claim shall be disallowed in its entirety. This Section 4.1 shall not affect the Bank Claim unless and until such claim has been acquired by the Bonding Companies according to the terms of this Plan, the Plan Agreements and the AIP.

    4.2   Class 2 (Bonding Companies' Secured Claim). Class 2 Claims are impaired. On the Effective Date, the Bonding Companies shall receive, in exchange for and in full satisfaction of the Bonding Companies' Secured Claim, all right, title and interest in and to the Transferred Assets. Any remaining Unsecured Deficiency Claim on account of the Bonding Companies' Secured Claim shall be disallowed in its entirety.

    4.3   Class 3 (Other Allowed Secured Claims). Class 3 Claims are not impaired. The Debtors are not presently aware of any other Allowed Secured Claims in Class 3. Except to the extent that the holder of a particular claim has agreed to a different treatment, as to each remaining Allowed Secured Claim, if any, at the sole option of the Debtors, either (1) the holder of such Claim shall be treated in accordance with the terms and conditions of all documents respecting such Claim and the legal, equitable or contractual rights to which each holder of such Claim is entitled shall not be altered; (2) as soon as practicable following the

EXHIBIT ___B___
Page __23__ of __46__ Pages

Effective Date, or on such other date thereafter as may be agreed upon by the Debtors and the holder of such Claim, the Debtors shall abandon the collateral securing such Claim to the holder of the Claim in full satisfaction and release of such Claim; or (3) as soon as practicable following the Effective Date, the holder of such Claim shall receive, on account of such Claim, Cash equal to the amount of its Allowed Secured Claim, or such lesser amount to which the holder of such Claim shall agree, in full satisfaction and release of such Claim. The Debtors shall designate one of the foregoing options with respect to the holders of Allowed Secured Claims in Class 3 on or before the date of the Confirmation Hearing. If the Debtors have not selected one of the foregoing options by such date, the Debtors shall be deemed to have selected option 2. To the extent the holder of an Allowed Secured Claim has an interest in the Estates' interest in the Transferred Assets, the rights of the holders of such claims shall be left unaffected by this Plan, provided that, the Bonding Companies are appointed as a representative of the Debtors under Section 1123(b)(3) of the Bankruptcy Code for the purpose of enforcing any Avoidance Litigation that would otherwise permit the Debtors to avoid any liens against any of the Transferred Assets, but only under the circumstances and according to the conditions set forth in the applicable Plan Agreement.

4.4   Class 4 (Yale Claim). . Class 4 Claims are impaired. Any other provision of the Plan to the contrary notwithstanding (i) the Bonding Companies shall undertake sole responsibility for the defense of the Yale Claim, at their sole expense, and (ii) the rights of Yale with respect to the Yale Claim shall be treated as set forth in this Section 4.4.

A.   Yale Resulting Trust Litigation. On or before the Effective Date, the Responsible Officer shall deposit the amount necessary to fund the Morgan Stanley Account (as such account is identified in the Yale Resulting Trust Litigation) in the principal amount of $2,885,028.00 plus all interest actually accrued on such amount while such funds have been on deposit in the Morgan Stanley Account to comply with the Bankruptcy Court's August 21, 1998, order in the Yale Resulting Trust Litigation (the "Trust Fund Order"), which total amount as of the Effective Date is $3,291,683.09 On and after the Effective Date, and pending resolution of the Yale Resulting Trust Litigation by Final Order or settlement, the Bonding Companies shall maintain such funds on deposit in the Morgan Stanley Account plus all interest accruing on such amount after the Effective Date (the "Yale Trust Funds").

B.   Appeal in Yale Resulting Trust Litigation. With respect to the Banks' appeal of the Yale Resulting Trust Litigation currently pending in the United States Court of Appeals for the Ninth Circuit, the Bonding Companies may be substituted for the Banks as the assignee of the Banks' interest. In the event that the judgment of the Bankruptcy Court with respect to the Yale Resulting Trust Litigation is affirmed by Final Order or the matter is settled, the Bonding Companies shall disburse the Yale Trust Funds immediately to Yale (including all interest accrued thereon before and after the Effective Date) or on such other terms as the parties may agree. In the event that the judgment of the Bankruptcy Court with respect to the Resulting Trust Litigation is not affirmed by Final Order, the Bonding Companies shall disburse the Trust Funds as directed by the Bankruptcy Court (or appellate court) by Final Order after notice and a hearing, or on such other terms as the parties may agree.

C.   Yale Recoupment Litigation. On and after the Effective Date, and pending resolution of the Yale Recoupment Litigation by Final Order or settlement, the Bonding Companies shall deposit and maintain from the Transferred Assets the additional sum of $506,408.30 in the Morgan Stanley Account (the "Yale Recoupment Funds") which amount, plus the sum of $733,880.09 currently on deposit in a certain account identified in the Yale Recoupment Litigation at Fleet Bank (the "Fleet Trust Account"), is sufficient to satisfy in full Yale's $1,240,288 33 claim asserted in the Yale Recoupment Litigation. With respect to the oppositions to Yale's claims in the Yale

EXHIBIT ___B___

Recoupment Litigation asserted by the Banks and the Committee, the Bonding Companies may be substituted for the Banks and the Committee as the Banks' and the Committee's assignee.  In the event and to the extent that the Bankruptcy Court (or appellate court) determines by Final Order that Yale is entitled to the Yale Recoupment Funds, or any portion thereof, the Bonding Companies shall disburse the Yale Recoupment Funds immediately to Yale in such amount and on such terms as the Bankruptcy Court (or appellate court) may determine by Final Order, or on such other terms as the parties may agree, subject to any right that the Bonding Companies may have to stay such distribution pending appeal.  Pending resolution of the Yale Recoupment Litigation by Final Order or settlement, Yale shall maintain possession and control of the Fleet Trust Account, and all funds on deposit in such account as previously provided by the Bankruptcy Court.  In the event and to the extent that the Bankruptcy Court (or appellate court) determines by Final Order that Yale is entitled to the funds on deposit in the Fleet Trust Account, or any portion thereof, Yale shall disburse such funds to itself in such amount and on such terms as the Bankruptcy Court (or appellate court) may determine by Final Order, or on such other terms as the parties may agree, subject to any right that the Bonding Companies may have to stay such distribution pending appeal.  In the event and to the extent that the Bankruptcy Court (or appellate court) determines by Final Order that Yale is not entitled to the funds on deposit in the Fleet Trust Account, or any portion thereof, Yale shall disburse such funds to the Bonding Companies in such amount and on such terms as the Bankruptcy Court (or appellate court) may determine by Final Order, or on such other terms as the parties may agree, subject to any right that Yale may have to stay such distribution pending appeal.

D.   Bond in Yale Resulting Trust Litigation.  On and after the Effective Date, the Bonding Companies shall be substituted for the Banks as the principal obligor under a certain bond (the "Bond") that the Banks posted in the amount of $600,000.00 in favor of Yale with respect to the Yale Resulting Trust Litigation, and shall be liable to Yale with respect to any claim that Yale may have on the Bond as may be determined by the Bankruptcy Court (the "Yale Bond Claim") as though asserted against the Banks.  Fidelity and Deposit Company of Maryland agrees that such substitution shall not affect or reduce its liability as surety under the Bond.

E.   Other Yale Claim   With respect to any portion of the Yale Claim asserted in any proof of claim filed by Yale, or arising under the Bank Cash Collateral Orders, the DIP Loan Orders, or any stipulation approved by the Bankruptcy Court, that is not paid or otherwise satisfied as a result of the Yale Recoupment Litigation, the Yale Resulting Trust Litigation, or the Yale Bond Claim (the "Yale Residual Claim"), Yale shall be entitled to assert such Yale Residual Claim as if the claim was an unsecured claim to the same extent as other unsecured creditors holding claims of the same priority but any recovery on the Yale Residual Claim shall (i) be paid solely from such portion of the Yale Recoupment Funds, the Yale Trust Funds, or funds on deposit in the Fleet Trust Account that are not otherwise payable to Yale, subject to the right of the Bonding Companies, as estate representative for such purpose, to object to all of such Yale Residual Claim, and (ii) not be paid as a distribution from the Retained Assets, the Debtors, the Reorganized Debtor or their property.

F.   Jurisdiction.  The Bankruptcy Court shall retain jurisdiction to determine the Yale Recoupment Litigation, the Yale Resulting Trust Litigation, the Yale Bond Claim, the Yale Residual Claim, and any of the rights of the parties with respect thereto  All funds maintained in the Morgan Stanley Account as provided herein shall remain subject to the rights and interests of Yale as determined by the Bankruptcy Court (or appellate court) as though maintained by the Debtor, and shall be held in trust for the purposes hereof pending final resolution by Final Order of the Yale Resulting Trust

Litigation, the Yale Recoupment Litigation, or the Yale Residual Claim and shall not be subject to any claim or interest of the creditor of the Bonding Companies until such claims are resolved by Final Order or settlement.

G.   Other.   As part of any final settlement of the Yale Claim, Yale shall execute and deliver such instruments reasonably required to effect the release and withdrawal of any secured, administrative, priority or unsecured Claims held or asserted by Yale against the Debtors, the Reorganized Debtor, the Bonding Companies, the Banks, the Retained Assets or the Transferred Assets. The resolution of the Yale Claims by the Bonding Companies will not entail the establishment or allowance of any Claims by subcontractors, suppliers or vendors on the Yale project against the Debtors, the Reorganized Debtor, the Bonding Companies, the Banks, the Retained Assets or the Transferred Assets.

4.5   Class 5 (Priority Employee Claims).   Class 5 Claims are not impaired. Each holder of a Priority Employee Claim shall receive a Cash payment equal to the difference between (i) the amount of such Claim and (ii) the amount of any Permitted Payments made to the holder of such Claim, unless such holder shall have agreed to different treatment of such Claim, at the sole option of the Debtors: (a) as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; or (b) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtors.

4.6   Class 6 (Allowed Convenience Claims).   Class 6 Claims are impaired. Each holder of an Allowed Convenience Claim shall receive, in exchange for and in full satisfaction of such Claim, a Cash payment equal to 15% of the amount of such Claim. Any holder of a Claim that would otherwise have been classified in Class 7, but for the timely election on the Ballot by the holder to reduce the aggregate of all its Claims to a single Claim of $2,500 and participate solely in Class 6, shall be deemed to have waived any right to participate in Class 7 as to any and all Claims held by such holder and shall receive no distribution under Class 7.

4.7   Class 7 (Allowed Unsecured Claims).   Class 7 Claims are impaired. Each holder of an Allowed Unsecured Claim shall receive, in exchange for and in full satisfaction of such Claim, a Pro Rata share of the Class 7 Proceeds, subject to the subordination provisions of Section 5.13 of this Plan.

4.8   Class 8 (Subordinated Claims).   Class 8 Claims are impaired. Each holder of a Subordinated Claim shall receive no distribution or any other consideration on account of such Claims under the Plan. Class 8 is deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code.

4.9   Class 9 (Interests and Claims).   Class 9 Interests and Claims are impaired. On the Effective Date, pursuant to Section 1141(d)(1)(B) of the Bankruptcy Code, all Interests shall be terminated. Each holder of an Interest or a Stock Rescission or Damage Claim based on such equity securities shall receive no distribution or any other consideration on account of such Interests or Claims under the Plan. Class 9 is deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code.

4.10   Nonconsensual Confirmation   Subject to performance of the AIP, the Debtors and the Committee hereby request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable as to the holders of Class 8 Claims and Class 9 Interests and Claims. In the event that any other impaired Class of Claims does not accept the Plan in accordance with Sections 1126 and 1129(a)(8) of the Bankruptcy Code, the Debtors and the Committee hereby reserve the right to (i) request that the Bankruptcy

1   Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code on the basis
    that the Plan is fair and equitable as to the holders of Claims in any such Class, or (ii) amend or
2   modify the Plan in accordance with its terms or as otherwise permitted. The Debtors and the
    Committee may not request confirmation of the Plan under Section 1129(b) of the Bankruptcy
3   Code over the objections of the Banks or the Bonding Companies.

4
                                      ARTICLE 5
5
                        MEANS FOR IMPLEMENTATION OF THE PLAN
6
             The Plan shall be implemented on the Effective Date. In addition to the provisions set
7   forth elsewhere in this Plan regarding means of execution, the following shall constitute the
    principal means for the implementation of the Plan.
8
             5.1    Acquisition of Bank Claim.  The Banks will assign the Bank Claim to the
9   Bonding Companies, and the Bonding Companies will deliver to the Banks, in full and final
    consideration for such assignment, (a) a Cash payment from the Bonding Companies equal to
10  the Bank Loan Debt, and (b) the Bank LC Put Agreement, duly executed by the Bonding
    Companies. The Bonding Companies will purchase the Bank Claim (i) without recourse,
11  liability or warranty of any kind, all of which are waived, and (ii) without necessity of any
    further filings or amendments, including any transfer documents under Bankruptcy Rule 3001,
12  provided that, the Banks shall execute such Plan Agreements as may be reasonably requested by
    the Bonding Companies to implement and evidence the acquisition of the Bank Claim in a
13  manner consistent with the AIP. Upon the Effective Date, as a consequence of the acquisition
    of the Bank Claim by the Bonding Companies, all secured, administrative, priority or unsecured
14  Claims held or asserted by the Banks shall be deemed satisfied and released and the Banks shall
    not be entitled to any other or further distribution under the Plan or from the Retained Assets,
15  the Debtors, the Reorganized Debtor or their property. Upon acquisition of the Bank Claim,
    the Bonding Companies shall hold an Allowed Secured Claim in the amount of the Bank Loan
16  Debt and the Bank LC Debt ("BC Bank Claim") which shall be classified and treated
    exclusively in accordance with Sections 2.2 and 4.1 of the Plan. Neither the Bank Claim, nor
17  any of the Banks' rights or security interests in connection therewith, shall be amended,
    modified or affected in any way by this Plan until the Bank Claim has been purchased by the
18  Bonding Companies under the terms set forth in the AIP, this Section 5.1 and the Plan
    Agreements.
19
             5.2    Retention of Property of the Debtors' Estates.  The Debtors shall retain the
20  Retained Assets.  The Books and Records related to the Retained Assets shall be retained by the
    Debtors. Upon the Effective Date (i) except for the Kiani Related Liens, all liens against and
21  security interests in the Retained Assets held or asserted by the Banks or the Bonding
    Companies shall be deemed released, extinguished and of no further force and effect, and (ii)
22  the Reorganized Debtor shall be revested with all right, title and interest in the Retained Assets
    for distribution among Creditors at the times, in the amounts and according to the treatment
23  provisions of the Plan. The Reorganized Debtor shall have and retain the benefit of any
    defenses and counterclaims available to the Debtors against any entity other than the
24  Reorganized Debtor with respect to the Retained Assets.

25           5.3    Transfer of Property of the Debtors' Estates.

26           A.     General.  After the acquisition of the Bank Claim under Section 5.1 of the
    Plan, the Plan Agreements and the AIP, the Debtors shall transfer the Transferred Assets
27  to the Bonding Companies. Upon the Effective Date (i) except for the Kiani Related
    Liens, all liens, security interests and Claims held by the Bonding Companies against the
28  Debtors under the BC Bank Claim (evidenced by the documentation governing such

                                      EXHIBIT       B

claim, including the Bank Credit Agreement and the Bank Cash Collateral Orders) shall be deemed satisfied, and (ii) all liens, security interests and Claims held by the Bonding Companies against the Debtors under the DIP Loans (evidenced by the documentation governing such claim, including the DIP Credit Agreement and the DIP Loan Orders), shall be deemed satisfied. As of the Effective Date, the Bonding Companies shall hold all right, title and interest in the Transferred Assets free and clear of all Claims and Interests and may use, transfer or dispose of the Transferred Assets free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules, provided that, the Bonding Companies' resolution, enforcement and collection of the Transferred Assets (as a representative of the Estates of the Debtors or otherwise) will not (i) result in any liability for professional fees or expenses against the Debtors, the Banks, the Reorganized Debtor or the Retained Assets, or (ii) entail the establishment or allowance of any Claims against the Debtors, the Banks, the Reorganized Debtor or the Retained Assets. Upon the Effective Date, with the sole exception of the BC Fixed Claim (and except as otherwise provided in Sections 5.14 and 5.15 of the Plan), all secured, administrative, priority or unsecured Claims held or asserted by the Bonding Companies shall be deemed satisfied and released and the Bonding Companies shall not be entitled to any other or further distribution under the Plan or from the Retained Assets, the Debtors, the Reorganized Debtor or their property.

B. <u>Certain Cash.</u> The Debtors will take the necessary steps to deliver the CAPC Cash, if material and otherwise requested by the Bonding Companies, to the Bonding Companies as part of the Transferred Assets. A Plan Agreement will provide the means for the delivery of the Holdings Cash to the Bonding Companies as part of the Transferred Assets. After the delivery of any Third Party Cash to the beneficiaries of such funds, if and to the extent the Debtors or Reorganized Debtor are or become entitled to any residual funds, such amounts shall be transferred to the Bonding Companies and shall constitute Transferred Assets. The Third Party JV Cash held by the Debtors shall be remitted into the custody of the Bonding Companies together with the Transferred Assets, provided that, the Bonding Companies shall continue to hold such cash as a custodian for the benefit of joint ventures, subject to, and to the extent required by, the terms and conditions of any applicable joint venture agreements.

C. <u>Scope of Transferred Assets.</u> The Transferred Assets comprise, without limitation, among other property: (1) all rights and interests of the Debtors in the La Jolla Towers Note and the Deed of Trust related to such note, and the ownership of and distributions from the Hyatt limited liability company that owns the La Jolla project; (2) all rights and interests of the Debtors in the surplus from any project; (3) all rights and interests of the Debtors in the D&O Litigation and the D&O Litigation Proceeds (less the Insider Action Proceeds); (4) the Talmadge claim; (5) the Stora claim; (6) the Debtors' joint venture interests, including without limitation the joint ventures involving Peter Kiewit Construction Co. and its affiliates, the joint ventures with J.M Cashman Company, the Eastside Reservoir joint venture, and the joint venture with J.A Jones Company, (7) all rights and interests of the Debtors in the Yale Funds, (8) Transferred Asset Proceeds, except to the extent applied prior to the Effective Date to reduce the Bank Claim in accordance with the Bank Cash Collateral Orders; (9) the Bank Third Party Claims; and (10) the Transferred Asset Recoveries.

D. <u>Expenses.</u> The fees and expenses which accrue after the Effective Date on account of or related to the Transferred Assets shall be paid from Transferred Assets In no event shall the Reorganized Debtor have any liability for any part of such fees and expenses after the Effective Date, regardless of the nature of the activities except with the prior written consent of the Reorganized Debtor.

EXHIBIT___B___
Page _28_ of _46_ Pages

E.   Books and Records   The Books and Records related to the Transferred Assets shall be delivered to the Bonding Companies on the Effective Date, or as soon thereafter as may be specified in the Books and Records Agreement, provided that, adequate arrangements for storage and maintenance expenses are addressed pending the delivery of the Books and Records. The Books and Records Agreement may permit the Bonding Companies to enforce the Debtors' rights to obtain turnover and possession of any Books and Records presently in the custody of third parties. The Books and Records Agreement will provide (i) that the Debtors or the Bonding Companies, to the extent they have or obtain possession of any accounting Books and Records, will supply copies to each other in computer-readable form, and (ii) for prompt efforts to obtain any Books and Records needed by the Debtors to respond to third-party discovery requests.

5.4   Allowance of Bonding Companies' Unsecured Claim.   Upon the Effective Date, the Bonding Companies' Unsecured Claim shall be reduced and allowed as a Class 7 general, unsecured nonpriority claim under Section 502 of the Bankruptcy Code in the amount of $55,000,000 ("BC Fixed Claim"). The BC Fixed Claim shall be classified and treated exclusively in accordance with Sections 2.2(g) and 4.7 of the Plan. The Debtors shall be authorized to expunge all other Bonding Companies' Unsecured Claims from the claims register maintained in the Chapter 11 Cases. The BC Fixed Claim shall not be subject to further objection, reduction, increase, defense, counterclaim, setoff or recoupment and shall be deemed allowed without necessity of any further filings or amendments, including any proof of claim The Bonding Companies shall be solely responsible for allocating any distributions on account of the BC Fixed Claim between F&D and AIG.

5.5   Holdings Trust Claims.   The Holdings Trust Claims will be deemed filed against the Reorganized Debtor and shall only be entitled to receive a distribution from the property of the Reorganized Debtor according to the provisions of this Plan. All objections, if any, to the allowance of any Holdings Trust Claim may be raised and asserted by the Reorganized Debtor, or any parties in interest in the Chapter 11 Cases, to the same extent and under the same grounds available to the Holdings Trust.

5.6   Holdings Trust   The provisions respecting governance and administration of the Holdings Trust shall be amended to conform, where necessary, to the provisions of the Plan.

5.7   Holdings Chapter 11 Case.   Following Confirmation, the Holdings Trust shall retain all rights and remedies set forth in the Holdings Trust Agreement or established under the Holdings Plan. The Court shall retain jurisdiction over the Holdings Trust in the Holdings Chapter 11 Cases or the Chapter 11 Cases as set forth in the Holdings Plan and the order confirming the Holdings Plan.

5.8   Settlement of Intercreditor Appeals and Intercreditor Litigation.   Upon the Effective Date, the Intercreditor Appeals and the Intercreditor Litigation shall be dismissed, without costs to any party, and all rights, claims and defenses asserted therein shall be deemed waived and released with prejudice. The compromise contained in this Section 5.8 of the Plan shall be effective without necessity of any further filings, provided that, the Banks, the Bonding Companies, the Debtors and the Committee shall execute and deliver, or join in the execution or delivery, of any instrument or pleading required to effect such compromise. Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the provisions of this Section 5.8 of the Plan constitute a settlement of all claims and controversies relating to matters asserted in the Intercreditor Appeals and the Intercreditor Litigation. The Debtors and the Committee request that the Bankruptcy Court approve this compromise at the Confirmation Hearing. The Confirmation Order shall constitute the determination by the Bankruptcy Court that the settlement contained in this Section 5.8 is in the best interests of the Debtors, the Holdings Trust, Creditors and the estate and is fair, equitable and reasonable. The Bonding Companies shall, within 30 days after the Effective Date, dismiss (i) all litigation related to these

EXHIBIT   B
Page 29 of 46 Pages

1    proceedings in which the Banks are an adverse party litigant, and (ii) all litigation in which the
Banks are a party against entities not party to the AIP, unless the Bonding Companies choose to
2    replace the Banks as a party litigant.

3       5.9    General Mutual Releases. On the Effective Date, in consideration for services
rendered and benefits received in the Atkinson Cases, the Debtors, the Holdings Trust, CAPC,
4    the Committee, the Banks and the Bonding Companies (and their respective past or present
members, officers, directors, agents, advisors, attorneys and representatives) shall be deemed to
5    have finally and irrevocably waived, released and relinquished any and all claims and causes of
action, if any, that each of them may have against another arising out of or related to such
6    person's actions or omissions to act in all of such person's capacities in connection with the
Atkinson Cases, provided that, this provision shall not operate as a release, waiver or
7    relinquishment of any such claims or causes of action (i) provided in or contemplated by the
Plan or the Plan Agreements, (ii) related to the Auditor·Litigation, or (iii) related to the D&O
8    Litigation. Each of the recipients of the release provided in this Section 5.9 shall be deemed to
have waived the benefit of the provisions of California Civil Code § 1542 (or any similarly
9    applicable statute). All objections to claims for interest, default interest, and professional fees
incurred by the Banks, the Bonding Companies, the Debtors and the Committee are settled,
10   provided that, (X) nothing bars any other Creditor, the United States trustee or the Bankruptcy
Court from examining or objecting to the Professional Fees of the Debtors and/or the
11   Committee, and (Y) all rights which constitute Avoidance Litigation are preserved.

12       5.10    Substantive Consolidation. Except as expressly provided in the Plan, the Debtors
shall continue to maintain their separate corporate existences for all purposes other than the
13   treatment of Claims under this Plan. Pursuant to the Confirmation Order, on the Effective
Date: (i) all ATKN Intercompany Claims will be eliminated; (ii) all Retained Assets of either of
14   the Debtors will be merged, or treated as though they were merged, into the Reorganized
Debtor; (iii) any obligation of either Debtor and all guarantees thereof executed by, or joint
15   liability of, either of the Debtors will be deemed to be one obligation of the Reorganized
Debtor, (iv) any Claims filed or to be filed in connection with any such obligation guaranteed,
16   or joint liability, will be deemed one Claim against the Reorganized Debtor; and (v) each and
every Claim filed in the individual case of either of the Debtors will be deemed filed against the
17   Reorganized Debtor. On the Effective Date, and in accordance with the terms of the Plan and
the Confirmation Order, all Claims against either of the Debtors based upon guarantees of
18   collection, payment or performance, or joint liability of either of the Debtors, as to the
obligations of the other Debtor, shall be discharged, released and of no further force and effect.
19   Notwithstanding any implication to the contrary, the Debtors shall be consolidated on the
Effective Date. The substantive consolidation of the Debtors shall not affect or impair any
20   rights, claims, remedies or defenses of (or between) the separate Debtors as of the Filing Date,
including with respect to any Avoidance Litigation (against third parties or between the separate
21   Debtors) or the Kiani Claim.

22       5.11    Colma. Upon the Effective Date, the Bonding Companies shall be deemed to
have assigned to the Reorganized Debtor all rights, remedies, claims, liens and interests held by
23   the Bonding Companies against Colma on account of any surety bonds issued by the Bonding
Companies on behalf of, or jointly with, Colma. Any such claims and liens of the Bonding
24   Companies against Colma are expressly preserved for the benefit of the Reorganized Debtor
and, if necessary, may be enforced against Colma, its representatives and any claimants or
25   creditors of Colma. Any Colma Distribution shall be earmarked exclusively for payment to
Zurich first on account of the Zurich ADL Claim and second on account of the Zurich
26   Administrative Claim

27       5.12    Exemption from Certain Taxes for Plan Transactions and Trumbull Sale.
Pursuant to Section 1146(c) of the Bankruptcy Code, the making or delivery of an instrument of
28   transfer under this Plan in connection with (i) the transactions contemplated to take place on the

EXHIBIT   B
Page___30___of_46__Pages

1  Effective Date, and (ii) the Trumbull Sale, shall not be taxed under any stamp tax or similar tax
2  against the Debtors, the Reorganized Debtor, or the Retained Assets.

3      5.13   Intercreditor Subordination.  The distribution to the Bonding Companies on
   account of the BC Fixed Claim shall be subordinated until the holders of other Allowed
4  Unsecured Claims (including Allowed Convenience Claims) have received up to $500,000 *plus*
   any Convenience Class Overage, from all Retained Assets *excluding* the Auditor Litigation.
5  The distribution to the holders of other Allowed Unsecured Claims (including Allowed
   Convenience Claims, but not including the BC Fixed Claim) shall be subordinated, *pro tanto*,
6  until the holders of the BC Fixed Claim have received a corresponding amount from *only* the
   Auditor Litigation.  For example, if the Retained Assets *excluding* the Auditor Litigation yield
7  an aggregate distribution to the holders of Allowed Unsecured Claims (other than the BC Fixed
   Claim) of only $400,000, then such holders shall only subordinate to the first $400,000
8  available for distribution to the holders of the BC Fixed Claim from *only* the Auditor Litigation.

9      5.14   Conduct and Treatment of Kiani Claim.  The Kiani Claim and the Kiani Related
   Liens shall be prosecuted and enforced in a manner consistent in all respects with the AIP, or as
10 otherwise agreed by the Responsible Officer, the Committee and the Bonding Companies in a
   Plan Agreement.  Such Plan Agreement will contain provisions, among others, specifying the
11 circumstances under which the Bonding Companies or the Reorganized Debtor will (i) pursue
   the Kiani Claim and share the Proceeds of the Kiani Claim, and (ii) enforce the Kiani Related
12 Liens and participate in the property secured by such liens.

13     5.15   Conduct and Treatment of Solar Tax Litigation.  The Solar Tax Litigation shall
   be prosecuted and enforced in a manner consistent in all respects with the AIP, or as otherwise
14 agreed by the Responsible Officer, the Committee and the Bonding Companies in a Plan
   Agreement.  Upon the Effective Date, Solar Tax Counsel shall shift its client relationship from
15 Agent to the Reorganized Debtor.

16     5.16   Conduct of Auditor Litigation.  The Auditor Litigation shall be prosecuted and
   enforced in a manner consistent in all respects with the AIP, or as otherwise agreed by the
17 Responsible Officer, the Committee and the Bonding Companies in a Plan Agreement.

18     5.17   D&O Litigation Injunction.  The Confirmation Order shall provide that no
   claims may be brought against former directors and officers of the Debtors as to matters
19 covered as assureds under certain D&O liability insurance other than those claims asserted in
   the D&O Litigation and that no claims may be brought against former officers and directors of
20 the Debtors as to matters covered as assureds under certain D&O liability insurance other than
   those currently named in the D&O Litigation.  The motion seeking approval of the settlement of
21 the D&O Litigation shall recite that the claimants in the settlement are the only parties to have
   made claims under the D&O liability insurance policy before the claims deadline expired in
22 June 1999, and therefore are solely entitled to the D&O Proceeds.

23     5.18   Appointment of Estate Representative.  The Bonding Companies are appointed as
   a representative of the Debtors under Section 1123(b)(3) of the Bankruptcy Code for the
24 purpose of prosecution and collection of any of the Transferred Assets.  The Bonding
   Companies are appointed as a representative of the Debtors under Section 1123(b)(3) of the
25 Bankruptcy Code for the purpose of enforcing any Avoidance Litigation that would otherwise
   permit the Debtors to avoid any liens against any of the Transferred Assets, but only under the
26 circumstances and according to the conditions set forth in the applicable Plan Agreement.  The
   Reorganized Debtor is appointed as a representative of the Debtors under Section 1123(b)(3) of
27 the Bankruptcy Code for the purpose of prosecution and collection of any of the Retained
   Assets.  The Plan Agreements shall provide for appropriate documentation permitting the
28 prosecution and absolute assignment of all claims, causes of action and other rights and benefits

1  with respect to the Transferred Assets, for the sole benefit, in the sole discretion, and at the sole expense of the Bonding Companies.

2

5.19   Dismissal of Bonded Project Avoidance Actions and Release of AICCO.  The
3  Debtors and the Committee shall dismiss all Bonded Project Avoidance Actions with prejudice on or as soon as practicable following the Effective Date.  Neither the Debtors, Holdings Trust,
4  CAPC or any Affiliates shall bring (i) any avoidance action against any bonded subcontractor that is a party to any Bonded Project Avoidance Action, or (ii) any avoidance action against
5  AICCO.

6     5.20   Payment of Reorganized Debtor Expenses.  All Reorganized Debtor Expenses consistent with the Reorganized Debtor Budget may be paid by the Disbursing Agent from the
7  Claims Reserve Account without further notice to Creditors or approval of the Bankruptcy Court.  The fees and expenses of professionals for the Reorganized Debtor and the Committee
8  which accrue after the Effective Date shall be paid from Retained Assets.  In no event shall the Banks or the Bonding Companies have any liability for any part of such fees and expenses after
9  the Effective Date, regardless of the nature of the professionals' activities except with the prior written consent of the Bonding Companies.

10

5.21   Power and Authority of Responsible Officer.  As of the Effective Date, the
11  Responsible Officer shall be deemed to have fulfilled his duties under the Responsible Officer Debtor Engagement and the Responsible Officer Orders and shall be released and discharged
12  from all further responsibilities thereunder, provided that, all outstanding amounts due the Responsible Officer under the Responsible Officer Debtor Engagement, including the RO
13  Incentive Compensation, shall remain payable according to the terms of such engagement and this Plan.  Following the Effective Date, the Responsible Officer shall continue to act as the
14  representative of the Reorganized Debtor and the Debtors pursuant to the terms and conditions of employment set forth in the Responsible Officer Creditor Engagement.  Confirmation of the
15  Plan shall constitute the appointment of the Responsible Officer by the Bankruptcy Court to exercise the rights, power and authority of each of the Debtors and the Reorganized Debtor
16  under applicable provisions of the Reorganization Law.  The Confirmation Order shall provide that the Responsible Officer is authorized to execute a certificate of dissolution for each of the
17  Debtors pursuant to applicable nonbankruptcy law, at such time as each Debtor has fully wound up its affairs in accordance with applicable law pursuant to the provisions of the Plan.

18

5.22   Postconfirmation Operations of the Debtors.  The Debtors and the Reorganized
19  Debtor shall conduct no business following the Effective Date other than winding up their affairs in accordance with applicable law and the provisions of this Plan.  Without limiting the
20  generality or effect of the foregoing, following the Effective Date, the Reorganized Debtor shall (a) undertake those transactions that are necessary, advantageous or practicable to obtain the
21  maximum value from the Retained Assets, and (b) exercise its best efforts and endeavor in good faith and without undue delay to liquidate all of the Retained Assets and successfully prosecute
22  the Avoidance Litigation  Pursuant to the Reorganization Law, (i) the Debtors shall be authorized to (X) wind up their respective affairs and dissolve, and (Y) put into effect and carry
23  out the terms of the Plan and any orders of the Bankruptcy Court entered in the Chapter 11 Cases, without further action by its board of directors or shareholders, and (ii) the Debtors'
24  Charters shall be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under Section 1123(a)(6) of the Bankruptcy Code.  On or as
25  soon as practicable following the Effective Date, the Reorganized Debtor shall be authorized to cause ATKN California, pursuant to applicable provisions of the Reorganization Law, to cancel,
26  annul and extinguish the ATKN Equity Securities and issue new capital stock to the Bonding Companies (or their designee) in conjunction with a voting rights agreement that corresponds to
27  the relative rights, interests and powers of the members of the Governance Committee.  The foregoing change in the capital stock of ATKN California will be made on the following terms
28  and conditions: (1) the rights, benefits and interests of the new capital stock of ATKN

EXHIBIT _B_
Page __32__ of __46__ Pages

California shall be consistent with the Plan and otherwise acceptable to the Reorganized Debtor, (2) the Reorganized Debtor shall be and remain entitled to file its tax returns on a separate basis (i.e., not consolidated with the holder of the new capital stock), and (3) arrangements acceptable to the Reorganized Debtor and the Bonding Companies shall have been adopted for the means of, and allocation of any benefits from, any potential disposition of any residual net operating loss carryforwards by the Reorganized Debtor.

5.23   Windup of Affiliate Affairs. The Responsible Officer of the Reorganized Debtor shall be authorized, to the fullest extent permitted under the Reorganization Law, to take any and all actions that either of the Debtors, as the sole or majority shareholder of any of the Affiliates, could otherwise take under applicable nonbankruptcy law (including the power to elect the board of directors of any Affiliate and to appoint or remove any officer or agent of any Affiliate). Upon the Effective Date, the Bonding Companies shall be deemed to have transferred and absolutely assigned to the Reorganized Debtor all of the Bonding Companies' rights and claims against Affiliates. The Bonding Companies will execute such documents and instruments as may be necessary or appropriate to effectuate this transfer.

5.24   Treatment of Employee Benefit Programs. As soon as practicable following the Effective Date, to the extent not otherwise accomplished prior to the Effective Date, a Plan Agreement shall specify whether (i) the Debtors shall terminate, discontinue, transfer or otherwise modify any extant Employee Benefit Programs pursuant to the respective terms of such programs and applicable nonbankruptcy law, or (ii) the Employee Benefit Programs shall be delivered with the Transferred Assets for further administration or termination by the Bonding Companies. All rights are reserved to assert that the agreements underlying any of the Employee Benefit Programs constitute executory contracts which are rejected pursuant to Section 6.1(b) of this Plan. Any amounts recovered, realized or refunded upon the termination or other cessation of the Employee Benefit Programs, shall be distributed under the Plan Agreement according to the responsibilities undertaken by either the Reorganized Debtor or the Bonding Companies for an Employee Benefit Program following the Effective Date.

5.25   Abandonment Following Effective Date. To the extent the Responsible Officer determines, in the reasonable exercise of his business judgment, that it would not be in the best interests of the Reorganized Debtor to continue to administer an asset of the Reorganized Debtor or of any Affiliate, then (a) with the consent of the Committee and the Bonding Companies, or (b) with the approval of the Bankruptcy Court after notice and opportunity for a hearing, he shall be entitled to abandon the asset. The Debtors, the Reorganized Debtor, the Bonding Companies, the Responsible Officer, and the Committee shall have no liability for assets abandoned in accordance with the foregoing procedure, and neither the Reorganized Debtor nor the Responsible Officer shall have any liability or responsibility for further administration of such abandoned assets or for any claims attributable to such abandoned assets which arise after the abandonment.

5.26   Distribution of Net Plan Proceeds. The Net Plan Proceeds shall be used to satisfy the payments required under the Plan, provided that, the Disbursing Agent shall only distribute such proceeds to the holders of Administrative Claims and Allowed Claims in such amounts and at such times as are set forth in this Plan. No payments or distributions shall be made by the Disbursing Agent on account of Disputed Claims unless and to the extent such Claims become Allowed Claims. The Net Plan Proceeds allocated to Disputed Claims will not be distributed but will be held in the Claims Reserve Account by the Disbursing Agent in accordance with this Plan pending resolution of such Disputed Claims.

5.27   Full and Final Satisfaction. Upon the Effective Date, the Disbursing Agent shall be authorized and directed to distribute the amounts required under the Plan to the holders of Administrative Claims and Allowed Claims according to the provisions of the Plan. Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to this

EXHIBIT   B
Page   33   of   46   Pages

Plan and the Debtor shall have no further liability on account of any Claims except as set forth in this Plan. All payments and all distributions made by the Disbursing Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims.

5.28   **Effect of Allowed Convenience Claim Reduction Election.** By voting to accept the Plan and marking the Ballot in the space provided for electing such treatment, the holder of (a) an Allowed Unsecured Claim in excess of $2,500, or (b) more than one Allowed Unsecured Claim which in the aggregate exceed $2,500, may elect to reduce the amount of all of such holder's Allowed Claim(s) to $2,500 and only receive treatment as the holder of a single Allowed Convenience Claim having a value of $2,500 on the terms provided in Section 4.6 of this Plan. A holder of an Allowed Unsecured Claim may only elect this treatment as to all of such holder's claims, provided that, a transferee of more than one Claim that has properly filed evidence of each transfer under Bankruptcy Rule 3001 shall not be considered a single holder of such transferred Claims for purposes of the election. Such an election constitutes a waiver of (a) the amount of the Allowed Unsecured Claim in excess of $2,500, and (b) all other Allowed Unsecured Claims of such holder. Any holder of an Allowed Unsecured Claim(s) electing treatment under Class 6 of this Plan shall be deemed to release the Debtors from any and all liability for any excess amount or additional claims and shall only hold one Allowed Convenience Claim in the amount of $2,500.

5.29   **Distribution Procedures.** Except as otherwise agreed by the holder of a particular Claim, or as provided in this Plan, all amounts to be paid by the Disbursing Agent under the Plan shall be distributed in such amounts and at such times as is reasonably prudent, provided that, distributions to the holders of Priority Employee Claims and Convenience Claims shall be made within 120 days after the later of the Effective Date or the date such claims become Allowed Claims, unless upon request of the Reorganized Debtor, for cause shown, a different date is established by order of the Bankruptcy Court. On the Effective Date, or as soon as practicable thereafter, the Disbursing Agent shall (a) marshal all then available Net Plan Proceeds, (b) establish and fund the Claims Reserve Account pursuant to Section 5.31 of the Plan, and (c) make interim and final distributions of Net Plan Proceeds in the amounts and according to the priorities set forth in Articles 3 and 4 of the Plan. Notwithstanding any provision to the contrary in this Plan, distributions may be made in full or on a Pro Rata basis depending on (i) the amount of the Administrative Claim or Allowed Claim, (ii) the then available Net Plan Proceeds and (iii) the then anticipated Net Plan Proceeds. The Disbursing Agent shall make the Cash payments to the holders of Allowed Claims and Administrative Claims: (X) in U.S. dollars by check, draft or warrant, drawn on a domestic bank selected by the Disbursing Agent in its sole discretion, or by wire transfer from a domestic bank, at the Disbursing Agent's option, and (Y) by first-class mail (or by other equivalent or superior means as determined by the Disbursing Agent).

5.30   **Disbursing Agent.** The Disbursing Agent may employ or contract with other persons or entities to perform the obligations created under the Plan. The Disbursing Agent may delegate any of its rights and responsibilities under the Plan to other persons or entities as necessary or appropriate to carry out speedy and inexpensive distributions to Creditors under the Plan. Such persons or entities shall receive reasonable compensation for services rendered and reimbursement for expenses incurred in connection with this Plan or any functions or responsibilities adopted under the Plan, which amounts may be deducted from the Claims Reserve Account as Reorganized Debtor Expenses.

5.31   **Claims Reserve Account.** On or as soon as practicable after the Effective Date, the Disbursing Agent shall (a) create the Claims Reserve Account, and (b) periodically deposit the Cash from the Retained Asset Proceeds into the Claims Reserve Account to satisfy the obligations created under the Plan. The Claims Reserve Account shall contain the following five sub-accounts: (1) Administrative Claims, (2) Priority/Secured Claims, (3) Convenience Claims, (4) Reorganized Debtor Expenses, and (5) Allowed Unsecured Claims. Each sub-

EXHIBIT ___B___
Page __34__ of __46__ Pages

account within the Claims Reserve Account shall contain an amount of Cash deemed sufficient by the Reorganized Debtor for distributions under this Plan on account of, and according to the relative priorities among, accrued and anticipated Administrative Claims, Reorganized Debtor Expenses, Allowed Claims and Disputed Claims. The Confirmation Order, or a subsequent order of the Bankruptcy Court, may specify or permit adjustments to the funding amounts for each sub-account in the Claims Reserve Account. The Disbursing Agent shall be authorized to transfer funds among sub-accounts as necessary to replenish any sub-accounts as and when distributions are made to Creditors. Upon the satisfaction in full of all Claims within the applicable sub-account, any remaining funds in such sub-account, plus any accrued earnings, shall be transferred to sub-account 5. Pursuant to Section 5.20 of the Plan, all Reorganized Debtor Expenses may be deducted and paid from sub-account 4 without further Bankruptcy Court approval. The Disbursing Agent shall periodically transfer all earnings and interest income in the Claims Reserve Account for deposit to sub-account 5. Unless otherwise provided in the Confirmation Order, the Claims Reserve Account shall be invested by the Disbursing Agent in a manner consistent with the objectives of Section 345(a) of the Bankruptcy Code.

5.32 <u>Resolution of Disputed Claims.</u> All objections to Claims shall be filed and served not later than one year following the Effective Date, unless upon request of the Reorganized Debtor, for cause shown, a different deadline is established by order of the Bankruptcy Court. If an objection is not timely filed by the deadline established in this Section 5.32, any remaining Disputed Claims shall be deemed to be Allowed Claims for purposes of this Plan. Unless otherwise provided in the Confirmation Order or the Responsible Officer Creditor Engagement, the Reorganized Debtor shall be authorized to settle, or withdraw any objections to, any Disputed Claims following the Confirmation Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of this Plan. Although each of the Committee and the Reorganized Debtor shall have standing as parties in interest to file objections to Claims, in no event shall the Committee and the Reorganized Debtor each be represented by different attorneys in such matters. The Bonding Companies shall also have standing as a party in interest to file objections to Claims.

5.33 <u>Reserve Provisions for Disputed Claims.</u> The Disbursing Agent shall implement the following procedures with respect to the allocation and distribution of Cash in the Claims Reserve Account to the holders of Disputed Claims that become Allowed Claims:

(a) Cash respecting Disputed Claims shall not be distributed, but, if necessary, shall be withheld by the Disbursing Agent in an amount equal to such distributions as would otherwise be made to the holders of such Claims based on the Disputed Claims Amount.

(b) For the purpose of establishing adequate and sufficient reserves for Disputed Claims, the estimated aggregate amount of Allowed Unsecured Claims entitled to share Pro Rata in the distribution of Class 7 Proceeds under Section 4.7 of the Plan shall be determined by the Bankruptcy Court, and such aggregate estimate may be adjusted from time to time pursuant to subsequent orders of the Bankruptcy Court. Accordingly, until the Final Resolution Date, all distributions to Class 7 Creditors shall be based upon the ratio of the amount of the Allowed Claim in Class 7 to the aggregate estimates established from time to time by the Bankruptcy Court.

(c) Upon the Final Resolution Date, all amounts remaining in any sub-accounts of the Claims Reserve Account, with the exception of an amount deemed reasonable and appropriate by the Disbursing Agent to be withheld for final expenses, shall be used for final distribution to Class 7 Creditors

EXHIBIT B

Page 35 of 16 Pages

(d)    For the purposes of effectuating the provisions of this Section 5.33, the Bankruptcy Court may estimate the amount of any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to Section 502(c) of the Bankruptcy Code for purposes of distribution under this Plan. In lieu of estimating the amount of any Disputed Claim, the Bankruptcy Court may determine the Disputed Claims Amount to be reserved for such Disputed Claim, or such amount may be fixed by agreement in writing by and between the Debtor and the holder thereof.

(e)    When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holders of such Allowed Claim, in accordance with the provisions of this Plan, Cash equal to a Pro Rata share of the Cash available within the applicable sub-account of the Claim Reserve Account.

(f)    Interim distributions may be made from time to time prior to the resolution by Final Order or otherwise of all Disputed Claims; provided that, the aggregate amount of Cash to be distributed at such time from the Claims Reserve Account is practicable in comparison to the anticipated costs of such interim distributions.

(g)    No holder of a Disputed Claim shall have any Claim against the Cash reserved with respect to such Claim until such Disputed Claim shall become an Allowed Claim. In no event shall any holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) from the Debtors or the Claims Reserve Account any payment (X) which is greater than the amount reserved for such Claim pursuant to this Section 5.33, or (Y) of interest earned in the Claims Reserve Account or any other compensation for delays in distribution. In no event shall the Debtors have any responsibility or liability for any loss to or of any amount reserved under the Plan.

(h)    To the extent a Disputed Claim ultimately becomes an Allowed Claim in an amount less than the Disputed Claim Amount reserved for such Disputed Claim, then the resulting surplus of Cash shall be retained in the Claims Reserve Account and shall be distributed among the holders of Allowed Claims. Upon the Final Resolution Date, any such surplus remaining in an amount less than $1,000 shall revert to, and be retained by, the Debtor pursuant to Section 347(b) of the Bankruptcy Code, and shall not be subject to the unclaimed property or escheat laws of any governmental unit

5.34    Disputed Payments.  In the event of any dispute between and among Creditors as to the right of any entity to receive or retain any payment or distribution to be made to such entity under the Plan, the Disbursing Agent may, in lieu of making such payment or distribution to such entity, instead hold such payment or distribution until the disposition thereof shall be determined by the Bankruptcy Court.

5.35    Unclaimed Property.  Any entity which fails to claim any Cash within 180 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Upon forfeiture, such Cash (including interest thereon) shall be deposited into the Claims Reserve Account to be distributed to holders of Allowed Claims in the same manner described in Section 5.33 for distribution of excess amounts.  Entities which fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor or any holder of an Allowed Claim to whom distributions are made by the Disbursing Agent.

5.36    Setoffs  Nothing contained in this Plan shall constitute a waiver or release by the Debtors of any right of setoff or recoupment the Debtors may have against any Creditor (other than the Banks or the Bonding Companies)

EXHIBIT B

Page 36 of 46 Pages

5.37   <u>Withholding Taxes</u>.  Pursuant to Section 346(f) of the Bankruptcy Code, the Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  The Debtor shall comply with all reporting obligations imposed on it by any governmental unit.

5.38   <u>Designation of Distributions on Account of Certain Tax Claims</u>.  All distributions under the Plan to Creditors on account of Tax Claims shall be allocated and first applied toward the satisfaction of any Trust Fund Tax Claims held by such Creditors.  The designation specified under this Section 5.38 shall be in furtherance of the successful implementation of the Plan and the continued efforts of the Responsible Officer following Confirmation to pursue and obtain the maximum amount of Retained Assets for the benefit of Creditors.

5.39   <u>Effect of Distributions Other Than Under This Plan</u>.

A.   <u>Insurance and Surety Bonds</u>.  If the holder of a Claim against the Debtors (including the holders of Claims for administrative expenses, but not including the Bonding Companies) also has recourse against or under (i) an insurance policy issued for the benefit of such holder, or for the benefit of the Debtors, or (ii) one of the Bonding Companies' Surety Bonds, then (a) such claim shall be deemed to be a Contingent Claim, and (b) such holder may not receive any distributions under this Plan on account of such claim until it has exhausted its remedies against such insurance or bond.  At such time, the amount of any Claim shall be reduced by all payments that the holder of such claim receives from or under the insurance or bond.

B.   <u>Other Recourse</u>.  If the holder of a Claim against the Debtors (including the holders of Claims for administrative expenses, but not including the Bonding Companies) also has recourse against or under another source of payment (*other than* the insurance or bonds referenced in subpart *A* of this Section 5.39), then the Reorganized Debtor may object to the allowance of such claim or to distributions on account of such claim under this Plan until the holder of such claim has exhausted its remedies against such other sources, <u>provided that</u>, each holder of such claim shall receive notice and an opportunity for a hearing on such relief.

# ARTICLE 6

## EXECUTORY CONTRACTS, LITIGATION AND INSURANCE

6.1   <u>Executory Contracts and Unexpired Leases</u>.

(a)   <u>Assumption</u>.  The Debtors will assume each of the executory contracts and unexpired leases identified on Exhibit A to this Plan (together with any additions, deletions, modifications or other revisions to such Exhibit as may be made by the Debtors prior to the Confirmation Date).

(b)   <u>Rejection</u>.  The Debtors will reject any and all other executory contracts and unexpired leases of the Debtors not expressly identified for assumption on Exhibit A to this Plan, not expressly assumed prior to the Confirmation Date, or not the subject of a pending motion to assume as of the Confirmation Date.  Any Claim for damages arising from the rejection of an executory contract or unexpired lease under this Plan shall be filed within thirty (30) days of the date of service of the notice of Confirmation described in Section 7.3 of the Plan, or be forever barred from asserting such Claim against the Debtors or any property of the Debtors and from sharing in any distribution under the Plan.  The Bonding Companies shall be appointed as a representative of the Debtors under Section 1123(b)(3) of the Bankruptcy Code for the purposes of (X) performing any act to collect any Transferred Asset Recoveries, subject to the restrictions on such actions set forth in Section 5.3(A) of the Plan, and (Y) defending any

EXHIBIT   B
Page  37  of  46  Pages

1  Claims asserted by the non-debtor parties against the Debtors arising from the rejection of an
   executory contract or unexpired lease.  Upon the Effective Date, all of the Debtors' rights to
2  any Transferred Asset Recoveries shall be transferred to the Bonding Companies with the
   Transferred Assets, and all amounts received by the Debtors on account of such recoveries shall
3  be paid to the Bonding Companies.

4              (c)    Designation by Bonding Companies.  Notwithstanding subparts (a) and (b)
   above, prior to Confirmation of the Plan, the Bonding Companies shall have the right, in their
5  sole discretion, to expressly designate:

6        1.    Any executory contracts for assumption and assignment to the Bonding
               Companies, provided that, (i) the contracts designated for assumption are
7              part of the Transferred Assets, (ii) any related Assumption Obligations are
               paid by the Bonding Companies or from the Transferred Assets, and (iii)
8              the Bonding Companies shall have the burden to demonstrate compliance
               with any applicable provisions of Section 365 of the Bankruptcy Code; or
9

10       2.    That any (i) agreements under which the Debtors formed a joint venture
               with any other person, or (ii) agreements under which the Debtors
               undertook a construction project, shall be neither assumed nor rejected by
11             the Debtors under this Plan and all legal, equitable and contractual rights
               to which the non-debtor parties to such agreements are entitled under
12             applicable law shall be left unaltered by, and untreated under, this Plan,
               provided that, (X) the Bonding Companies shall be appointed as a
13             representative of the Debtors under Section 1123(b)(3) of the Bankruptcy
               Code for the purpose of performing any act under any such joint ventures
14             or agreements, (Y) upon the Effective Date, all of the Debtors' interests
               under any such joint ventures or agreements shall be transferred to the
15             Bonding Companies with the Transferred Assets, and all Proceeds from
               the Debtors' interest in any such joint ventures or agreements shall be paid
16             to the Bonding Companies, and (Z) the legal, equitable and contractual
               rights to which the non-debtor parties to such agreements are entitled shall
17             include (aa) rights under orders of the Bankruptcy Court entered prior to
               Confirmation, and (bb) obligations of the Debtors, or the Bonding
18             Companies as the representative or transferee of the Debtors, under orders
               of the Bankruptcy Court entered prior to Confirmation.
19

20     6.2    Satisfaction of Assumption Obligations.  Except as provided in Section 6.1(c)(1)
   of the Plan, the Debtors shall satisfy all Assumption Obligations by making a Cash payment, in
21  the manner provided in Section 3.1, equal to the lesser of the amount: (a) set forth in any proof
   of Claim respecting such Assumption Obligations, (b) set forth in any notice filed and served in
22  connection with the Confirmation Hearing, or (c) agreed to in writing between the Debtors and
   the non-debtor parties to such contracts or leases, unless an objection to such proposed
23  treatment is filed with the Bankruptcy Court and served on counsel to the Debtors on or prior to
   the date set by the Bankruptcy Court for filing objections to Confirmation of the Plan and the
24  Court after notice and hearing determines that the Debtors are obligated to pay a different
   amount under Section 365 of the Bankruptcy Code, in which case, the Debtors shall have the
25  right within ten (10) days after such determination to seek an order of the Bankruptcy Court
   rejecting such executory contract or unexpired lease.

26     6.3    Effect of Confirmation Order.  The Confirmation Order shall constitute an order
   of the Bankruptcy Court approving the assumption or rejection, as the case may be, pursuant to
27  Sections 365 and 1123(b)(2) of the Bankruptcy Code of all executory contracts and unexpired
   leases under this Article of the Plan.  The contracts and leases identified in this Plan will be
28  assumed or rejected, respectively, only to the extent that such contracts or leases constitute

EXHIBIT       B
Page  38  of  46  Pages

517075 9

1   executory contracts or unexpired leases, and the identification of such agreements under this
2   Plan does not constitute an admission with respect to the characterization of such agreements or
    the existence of any unperformed obligations, defaults, or damages thereunder.

3       6.4   **Postpetition Agreements**. Unless inconsistent with the provisions of the Plan, all
    contracts, leases and other agreements entered into by the Debtors on or after the Filing Date,
4   or previously assumed by Debtors, which have not been breached or terminated in accordance
    with their terms by the Debtors by the Confirmation Date, shall be performed by the Debtors in
5   the ordinary course of business and shall survive and remain in full force and effect following
    Confirmation.
6
        6.5   **Insurance**. Any insurance policy acquired for the benefit of the Debtors,
7   Holdings, CAPC, any Affiliates, the Responsible Officer (or any officers and directors of any
    of the foregoing) before or after the Filing Date shall remain in full force and effect after the
8   Effective Date according to its terms.

9       6.6   **Avoidance Litigation**. Pursuant to Section 1123(b)(3) of the Bankruptcy Code,
    the Debtors, the Reorganized Debtor and the Committee shall retain and may enforce all
10  Avoidance Litigation, whether or not pending on the Effective Date.

11      6.7   **Indemnification Obligations**. Any and all obligations of the Debtors to
    indemnify, reimburse or limit the liability of its former directors, officers or employees that
12  were directors, officers or employees, respectively, on or before the Filing Date against any
    obligations, pursuant to the Debtors' articles of incorporation, bylaws, applicable law or specific
13  agreements, or any combination of the foregoing, to the extent arising from executory contracts,
    shall be deemed rejected as of the Effective Date.
14
                                    **ARTICLE 7**
15
                CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN
16
        7.1   This Plan shall not be confirmed and the Bankruptcy Court shall not enter the
17  Confirmation Order unless and until each of the following conditions has been satisfied or duly
    waived:
18
            (a)   The Bankruptcy Court shall have entered the Confirmation Order with the
19  Confirmation Findings.

20          (b)   The Bankruptcy Court shall have reduced the period the Confirmation
    order is stayed under Bankruptcy Rule 3020(e) from 10 days to five days, or such other
21  period as shall permit the Effective Date to occur on or before April 10, 2000.

22          (c)   All Plan Agreements shall have been filed with the Bankruptcy Court and
    served on the parties identified in the Service List (Plan) in substantially final form
23  *unless* such filing and service is not made as determined by the parties to such agreement
    to protect against the disclosure of confidential information.
24
        7.2   The Debtors and the Committee may waive (in whole or in part) any of the
25  conditions set forth in Sections 7.1(a)-(c) of the Plan, *provided that*, the Banks and the Bonding
    Companies consent to such waiver.
26
        7.3   As soon as practicable following the Effective Date of the Plan, the Debtors shall
27  file and serve notice of the entry of the Confirmation Order in the manner required under
    Bankruptcy Rule 2002(f). The notice shall further identify the Effective Date and shall set forth
28  the last day to file any Claim for damages arising from the rejection of an executory contract or

EXHIBIT   B
Page 39 of 46 Pages

1  unexpired lease under this Plan and any other deadlines that may be established under the Plan
   or the Confirmation Order.  The notice may contain such other information as may be necessary
2  or appropriate to implement the Plan and create the Service List (New).

3

## ARTICLE 8

4

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

5
      8.1    This Plan shall not be consummated and the Effective Date shall not occur unless
6  and until each of the following conditions has been satisfied or duly waived:

7          (a)    The Bank Claim shall have been purchased by the Bonding Companies and
   the Bank LC Put Agreement shall have been delivered to the Banks according to the AIP
8  and Section 5.1 of the Plan.  Neither the Bank Claim, nor any of the Banks' rights in
   connection therewith shall be amended, modified or affected in any way by this Plan
9  until the Bank Claim has been purchased by the Bonding Companies under the terms set
   forth in the AIP and Section 5.1 of the Plan.
10
           (b)    All Plan Agreements shall be executed and delivered in a form reasonably
11  satisfactory to the Debtors, the Committee, the Banks and the Bonding Companies.

12         (c)    The Responsible Officer shall have determined that the probable aggregate
   amount of (i) accrued but unpaid Administrative Claims, (ii) accrued but unpaid Priority
13  Employee Claims, and (iii) accrued but unpaid Priority Tax Claims, will not exceed the
   difference between (x) the estimated amount of Starting Cash as of the Effective Date
14  and (y) a prudent reserve for Reorganized Debtor Expenses.

15         (d)    The D&O Retention shall have been amended in a manner consistent in all
   respects with the AIP.
16
           (e)    The D&O Settlement Conditions shall have been satisfactorily negotiated
17  among the Debtors, the Committee, the Banks and the Bonding Companies

18         (f)    The Effective Date is on or before April 10, 2000.

19         (g)    The Confirmation Order is not stayed.

20    8.2    The Debtors and the Committee may waive (in whole or in part) any of the
   conditions set forth in Sections 8.1(a)-(g) of the Plan, provided that, the Banks and the Bonding
21  Companies consent to such waiver.

22    8.3    This Plan may not be amended or modified without the consent of the Banks and
   the Bonding Companies.  In addition, this Plan shall be immediately withdrawn if it is not
23  confirmable or confirmed in its present form, without amendment, unless the Banks and the
   Bonding Companies consent.  Notwithstanding Section 9 below, no provision of this Plan
24  purporting to affect the Bank Claim or any of the Banks' rights or security interests in
   connection therewith shall be effective until the Bank Claim has been purchased by the Bonding
25  Companies under the terms set forth in the AIP, Section 5.1 of the Plan and the applicable Plan
   Agreements.  The Banks' rights to recover the full amount of the Bank Claim are fully reserved
26  and shall not be affected unless the conditions set forth in Section 8 of this Plan are satisfied

27

28

## ARTICLE 9

## EFFECTS OF CONFIRMATION

9.1   Binding Effect.  Confirmation of the Plan shall bind and govern the acts of the Reorganized Debtor and all Creditors whether or not (i) the Claim of such entity is impaired under the Plan, (ii) such entity has accepted the Plan.

9.2   Revesting of Property of Debtors.  Upon the Effective Date, title to all Retained Assets shall vest in the Reorganized Debtor for the purposes contemplated under the Plan and shall no longer constitute property of the Estates created for the Debtors in the Chapter 11 Cases pursuant to Section 541 of the Bankruptcy Code.

9.3   Property Free and Clear.  All property that shall revest in the Reorganized Debtor shall be free and clear of all Claims and interests, including liens, charges or other encumbrances of Creditors.  Following the Effective Date, the Reorganized Debtor may transfer and dispose of any property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

9.4   Injunction.  Pursuant to Sections 524(a)(1) and (2) of the Bankruptcy Code, upon the Effective Date, all entities who have held, currently hold or may hold a Claim treated under the Plan shall be, to the fullest extent permitted by law, permanently restrained and enjoined from asserting any Claims (based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date) against the Reorganized Debtor or its property or taking any act to enforce such Claims, and the Confirmation Order shall preclude all such entities, their successors and assigns, from enforcing or seeking to enforce any such Claims, provided, however, that all holders of Claims shall be entitled to prosecute their respective proofs of Claim and enforce their rights under the Plan.

9.5   Channeling of Claims.  The rights afforded under the Plan and the treatment of all Claims and Interests (including Claims arising after the Effective Date and Reorganized Debtor Expenses) under the Plan shall be the sole and exclusive remedy on account of such Claims and Interests against the Debtors, the Reorganized Debtor, and the Retained Assets, including any interest accrued on such Claims from and after the Filing Date or interest which would have accrued but for the commencement of the Chapter 11 Cases.  All holders of all Claims and Interests against the Debtors shall be bound by the Plan and the other Plan Agreements on the Effective Date, whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant to section 501 of the Code; (ii) a Claim or Interest is allowed pursuant to section 502 of the Code, or (iii) the holder of a Claim or Interest based on such debt or interest has accepted the Plan.  Any claim or cause of action asserted against the Reorganized Debtor, the Responsible Officer or the Committee or their professionals and agents arising out of or related to the conduct of the Chapter 11 Cases, whether before or after the Effective Date, shall be commenced only in the Bankruptcy Court.  Notwithstanding the foregoing, nothing provided in this Plan shall be deemed to grant a discharge to the Debtors.

9.6   Limitation of Liability.  The Debtors, the Committee, the Banks, the Bonding Companies, and the Responsible Officer, and their respective agents, advisors, attorneys and representatives will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Cases; provided, however, that this limitation will not affect or modify the obligations created under this Plan

EXHIBIT     B
Page   41   of   46   Pages   159

9.7   <u>No Effect on Other Entity Liability</u>.  Pursuant to Section 524(e) of the Bankruptcy Code, Confirmation of the Plan shall not affect or discharge the liability and defenses of Creditors and the Bonding Companies, respectively, under the Bonding Companies' Surety Bonds.

## ARTICLE 10

## RETENTION OF JURISDICTION

From and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

(a)   To hear and determine any and all objections to the allowance of a Claim, actions to equitably subordinate Claims, or any controversy as to the classification or amount of a Claim in a particular Class under the Plan;

(b)   To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date;

(c)   To hear and determine any and all motions for the rejection of executory contracts and unexpired leases and to fix and allow any Claims arising therefrom;

(d)   To hear and determine any and all applications by Professionals for an award of Professional Fees;

(e)   To enable the Reorganized Debtor to commence and prosecute any Avoidance Litigation which may be brought after the Effective Date;

(f)   To authorize the abandonment of assets by the Reorganized Debtor pursuant to this Plan;

(g)   To interpret and/or enforce the provisions of the Plan, any Plan Agreements and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document or instrument contemplated by the Plan, including any Plan Agreements;

(h)   To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified or vacated;

(i)   To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(j)   To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(k)   To authorize and instruct the Responsible Officer in connection with the performance of his rights and duties on behalf of the Reorganized Debtor following the Effective Date;

(l)   To hear and determine any disputes between, respectively, the Debtors, the Reorganized or the Bonding Companies, and the non-debtor parties to any contracts

1  or agreements, to the same extent the Bankruptcy Court had or could exercise
2  jurisdiction over such disputes prior to Confirmation under any orders of the Bankruptcy
   Court, the Bankruptcy Code or applicable law;

3      (m)    To hear and determine any litigation transferred to the Bonding Companies
4  under this Plan; and

5      (n)    To close the Chapter 11 Cases when administration of the case has been
   completed.

6

7                                **ARTICLE 11**

8                                **MISCELLANEOUS**

9      11.1  <u>Role of Committee</u>. Following Confirmation, the Committee shall remain
   authorized to participate in the Chapter 11 Cases, and shall continue as a party in interest, with
10 respect to (i) any rights, responsibilities and obligations arising under the Plan and the
   Confirmation Order, (ii) the duties undertaken by the Committee or its designee(s) as a member
11 of the Governance Committee, (iii) the duties undertaken by the Committee under the
   Responsible Officer Creditor Engagement, (iv) final fee applications, (v) any contested matters
12 or adversary proceedings in which the Committee is or may be a party litigant, and (vi) any
   matters and proceedings which could give rise to Allowed Unsecured Claims. Notwithstanding
13 anything to the contrary in this Section 11.1, the Committee will automatically be dissolved, all
   powers of the Committee will terminate, and the members of the Committee will be released
14 and discharged from all duties and obligations in or related to the Chapter 11 Cases, two years
   after the Effective Date of the Plan, unless extended by the Bankruptcy Court for good cause
15 shown.

16     11.2  <u>Defects, Omissions and Amendments</u>. The Debtors and the Committee may,   -
   with the approval of the Bankruptcy Court and without notice to all holders of Claims, insofar
17 as it does not materially and adversely affect holders of Claims, correct any defect, omission or
   inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to
18 expedite the execution of the Plan. The Plan may be altered or amended before or after
   Confirmation as provided in Section 1127 of the Bankruptcy Code if the Bankruptcy Court
19 determines that the modification does not materially and adversely affect the interests of holders
   of Claims. The Plan may be altered or amended before or after the Confirmation Date in a
20 manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders
   of Claims, only after a further hearing and acceptance of the Plan as so altered or modified as
21 provided in Section 1126 of the Bankruptcy Code.

22     11.3  <u>Filing of Plan Agreements and Other Documents</u>. The Bonding Companies shall
   file with the Bankruptcy Court the Plan Agreements.   The Debtors and the Committee shall file
23 with the Bankruptcy Court such other documents as may be necessary or appropriate to
   effectuate and further evidence the terms and conditions of the Plan. The Plan Agreements, and
24 all rights, remedies, duties, compromises and obligations embodied therein, are essential to and
   constitute a material and integral part of this Plan; accordingly, the Plan Agreements are hereby
25 incorporated into this Plan in their entirety by this reference as if set forth in full. Any Plan
   Agreement may be modified, before or after the Effective Date, if the modification is consented
26 to by the Debtors, the Committee, the Bonding Companies, and all the parties (or their
   successors) to such Plan Agreement, so long as the Bankruptcy Court, after such notice as it
27 deems appropriate, determines that the modification does not materially and adversely affect the
   rights of any Class of Claims under the Plan.

28

EXHIBIT _B_
Page _43_ of _46_ Pages

11.4   Governing Law.  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of California.

11.5   Severability.  Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

11.6   Successors and Assigns.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such entity.

11.7   Revocation and Withdrawal.  The Debtors and the Committee reserve the right to revoke and withdraw the Plan at any time on or before the Confirmation Date.  If the Debtors or the Committee revoke or withdraw the Plan pursuant to this section, or if the Effective Date does not occur on or before April 10, 2000 (unless this date is extended or waived), then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute an admission of any liability or a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any entity in any further proceedings involving the Debtors.  Without limiting the generality of the foregoing, if the Effective Date does not occur within the time period required by this Plan, (a) the Confirmation Order shall be deemed vacated, (b) the Chapter 11 Cases shall continue as if Confirmation had not occurred, (c) the Plan, and any Plan Agreements to the extent they are contingent upon the occurrence of the Effective Date, shall be of no further force and effect, and (d) the Debtors, the Committee, and the other parties to the Plan Agreements shall be placed in the same position as if Confirmation had not occurred.  Notwithstanding the foregoing, the failure of the Effective Date to occur within the time period required by this Plan, and the consequences thereof as set forth above, shall not affect the validity of any order entered in the Chapter 11 Cases other than the Confirmation Order.

11.8   Interpretation.  The provisions of the Plan will control over any descriptions of the Plan contained in the Disclosure Statement.  The Plan will be construed to avoid any inconsistencies with the provisions of the Confirmation Order and the Plan Agreements but, in the event of an inconsistency, (i) the Confirmation Order will control over a provision of the Plan or the Plan Agreements, and (ii) the Plan Agreements will control over a provision of the Plan, provided that, the Plan shall always control over an inconsistent provision of a Plan Agreement to the extent such provision would adversely vary the treatment of Creditors under the Plan, or adversely affect the rights of the Reorganized Debtor under the Plan.  The Plan Agreements are intended only to carry out the Plan and supply additional specificity to the transactions contemplated by the Plan.  Except as expressly referenced in the Plan, or as otherwise necessary to consummate any transactions or enforce any rights between the Banks and the Bonding Companies, the AIP is superseded in its entirety.  Whenever this Plan refers exclusively to the Debtors or the Reorganized Debtor in connection with their duties, responsibilities, rights, claims or activities following the Effective Date, such reference shall be construed to include the Debtors *and* the Reorganized Debtor.

EXHIBIT ____B____
Page __44__ of __46__ Pages

1     11.9   Implementation and Cooperation.  Upon Confirmation, the Debtors, the Committee, the Banks and the Bonding Companies shall be authorized to take all steps and

2 execute all documents necessary to effectuate the provisions contained in the Plan.  Pursuant to Section 1142(b) of the Bankruptcy Code, the Banks and the Bonding Companies shall cooperate

3 with the proponents of the Plan by performing all necessary acts to consummate the Plan and the transactions contemplated under the Plan.

4

5 Dated:  San Francisco, California
            March 31, 2000

6

7                                  Respectfully submitted,

8                                  ATKN COMPANY OF CALIFORNIA

9                               By:_____

10                                  E. Lawrence Hill, Jr.
                               Responsible Officer

11

12                                ATKN COMPANY

13                               By:_____

14                                  E. Lawrence Hill, Jr.
                               Responsible Officer

15                                OFFICIAL COMMITTEE OF UNSECURED
                               CREDITORS OF ATKN COMPANY

16

17                               By:_____

18                                  An Authorized Representative
                               Counsel for Committee
                               Henry C. Kevane

19

20 Submitted by:

21 PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

22 _____ 3/31/00

23     Henry C. Kevane

24 Attorneys for the Official Committee of
Unsecured Creditors of ATKN Company

25 MURPHY SHENEMAN JULIAN & ROGERS
A Professional Corporation

26

27 _____
    Margaret Sheneman

28 Attorneys for Debtors

EXHIBIT ___B___
Page __45__ of __46__ Pages

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

## Assumed Contracts and Leases

# N O N E

EXHIBIT __B__
Page __46__ of __46__ Pages

```
 1   MURPHY, WEIR & BUTLER
     A Professional Corporation
 2   PATRICK A. MURPHY (S.B. No. 038832)
     MARGARET SHENEMAN (S.B. No. 072718)
 3   TOBIAS S. KELLER (S.B. No. 151445)
     101 California Street, 39th Floor
 4   San Francisco, CA  94111
     Telephone Number:  415/398-4700
 5   Facsimile Number:  415/421-7879
 6   Attorneys for the Debtors
 7
```

**FILED**

**JAN - 9 1998**

**KEENAN G. CASADY, CLERK**
UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO CA

```
 8              UNITED STATES BANKRUPTCY COURT
 9              NORTHERN DISTRICT OF CALIFORNIA
10
11   In re                          )   Chapter 11
                                    )
12   GUY F. ATKINSON COMPANY OF     )   Jointly Administered for
     CALIFORNIA, a Delaware         )   Procedural Purposes Only under
13   corporation;                   )
                                    )   Case Nos. 97-33694-TC
14   GUY F. ATKINSON COMPANY,       )
     a Nevada corporation;          )   ORDER AUTHORIZING INTERIM
15                                  )   PROCEDURES AGREEMENT WITH
     GUY F. ATKINSON HOLDINGS, LTD.,)   CLARK
16   a Canadian federal corporation,)
                                    )
17              Debtors.            )   Hearing
                                    )   Date:  January 9, 1998
18                                  )   Time:  10:30 a.m.
                                    )   Place: 235 Pine Street
19                                  )          San Francisco, CA
                                    )   The Honorable Thomas Carlson
20   _____)
21
22            This matter having came on for hearing on January 9, 1998,
23   upon the motion of Guy F. Atkinson Company of California, Guy F.
24   Atkinson Company, and Guy F. Atkinson Holdings, Ltd., debtors and
25   debtors in possession herein ("Debtors"); counsel for the Debtors
26   and counsel for the official Unsecured Creditors Committee (the
27   "Committee"), counsel for Fidelity and Deposit Company of Maryland
```

ORDER AUTHORIZING INTERIM
PROCEDURES AGREEMENT WITH CLARK

5262\P3818.MS/rs

EXHIBIT _____ C_____
Page _____1_____ of _____26_____ Pages

and American Insurance Group of Companies and their affiliates (the "Bonding Companies") and counsel for Wells Fargo Bank, N.A., as agent for a group of banks and other lenders (the "Banks") having stated their appearances for the record; the court having considered the Debtors' Motion for Authority to Enter Into Interim Procedures Agreement with Clark (the "Motion") and the Declarations of John Whitsett and Thomas Lumsden filed in support thereof, the Request for Judicial Notice of the Declaration of Peter Rosenberg, the responses and declarations filed by creditors, and the arguments of counsel; and good cause appearing therefore,

The Court hereby makes the following findings of fact and conclusions of law:

A.    Notice of the Motion and the hearing on the Motion, was provided to all entities in the All Notices List pursuant to this Court's Case Management Order, and to all persons who have expressed interest in acquiring, merging with, or investing in the Debtors, and was reasonable and appropriate under the circumstances of this case.

B.    The Debtor seeks authority to enter into an Interim Procedures Agreement in the form attached hereto as Exhibit A, ("Interim Procedures Agreement") and to transfer substantially all of its employees to The Clark Construction Group, Inc. ("Clark") or a new entity which would be a subsidiary of Clark and to enter into a construction management contract with Clark.  All defined terms in the Interim Procedures Agreement shall have the same meanings herein unless otherwise defined.

C.    The Debtors have engaged in a fair and thorough

EXHIBIT __C__
Page __2__ of __26__ Pages

process to search for a potential buyer, merger candidate, or investor since the filing of these petitions on August 10, 1997. Several entities have expressed interest in buying, merging with, or investing in the Debtors, but Clark is the only entity which is prepared to proceed promptly, without additional due diligence and without the contingency of obtaining outside financing.

D.   On December 31, 1997, the Debtors served their Motion for authority to enter into a non-solicitation agreement and pay expenses of Clark and to establish sales procedures and overbid rules, and attached thereto a copy of the Clark Term Sheet and served such motion and Clark Term Sheet on the All Notices List and on all potential buyers, merger candidates, and investors who had previously expressed any interest in a transaction with the Debtors. Said motion invited such entities, prior to the final hearing scheduled for January 23, 1998 on this Motion, to submit a bid and demonstrate their ability to promptly close a transaction.

E.   The Debtors' continued viability as a going concern enterprise is eroding due to the Debtors' inability to obtain bonding capacity for new projects, financing to invest in joint venture projects, and adequate funds to pursue recovery of disputed claims.  In addition, the Debtors have lost certain key employees and are at risk to lose additional key employees in the near future because of the uncertainty of the Debtors' financial and operational future.  The Debtors' financial projections, attached to the Declaration of Lumsden demonstrate that there is the potential for recovery for unsecured creditors, but only if the Debtors obtain financing or capital infusions to invest in joint ventures, pursued



EXHIBIT____C____
Page___3___of_24___Pages

1  disputed claims litigation, and complete ongoing construction

2  projects.

3      F.   There is a low probability that unsecured creditors

4  will realize any recovery on their claim if the Debtors are

5  liquidated without any infusion of cash to fund joint ventures,

6  disputed claims litigation, and completion of ongoing projects.

7      G.   The transfer of employees and the interim

8  construction management agreement described in the Interim

9  Procedures Agreement and in the Clark Term Sheet are reasonable

10  steps which are likely to lead to the confirmation of a plan of

11  reorganization.

12      H.   The Interim Procedures Agreement and the Clark Term

13  Sheet have substantial support from the Bonding Companies.  The

14  Bonding Companies may have claims of over $70 million, and hold a

15  junior security interest on virtually all assets of the Debtor and

16  may also assert a substantial unsecured claim in these Chapter 11

17  cases.  The Interim Procedures Agreement is likely to lead to the

18  filing of a Chapter 11 plan of reorganization which could meet the

19  standards of confirmation set forth in the Bankruptcy Code.

20      I.   The Debtors have also filed a Motion requesting that

21  this Court establish fair procedures for any overbids to be

22  submitted before the conclusion of the hearing on the Debtors'

23  disclosure statement.

24      J.   The Clark Term Sheet was negotiated by the Debtors,

25  Clark, and the Bonding Companies in good faith, arms' length

26  negotiations.  The Debtors' Motion for approval of the Interim

27  Procedures Agreement has been proposed in good faith.

ORDER AUTHORIZING INTERIM
PROCEDURES AGREEMENT WITH CLARK                    4                    5262\P3818.MS/rs



EXHIBIT ___C___

Page___4___of_26_Pages

K.   The construction management features of the Interim Procedures Agreement do not constitute the assumption, assumption and assignment, or rejection of any of Debtors' contracts with any project owner, subcontractor, vendor, or joint venture, but are appropriate means to preserve the rights of all parties to such contracts pending confirmation of a chapter 11 plan.

L.   There is a valid business justification for the Debtor to enter into the employee transfer and interim construction management provisions of the Interim Procedures Agreement. The execution and performance of the Interim Procedures Agreement is a valid exercise of the Debtors' business judgment and the use of the Debtors' property under Bankruptcy Code section 363.

M.   Any agreement by which the Debtor transfers most of its employees to another entity and enters into an interim management agreement, before a Chapter 11 plan of reorganization is confirmed, is extraordinary and requires the Court to exercise particular scrutiny in evaluating the justification for such agreement and the terms thereof. Applying such scrutiny to this Interim Procedures Agreement, the court finds that it is reasonable and justified in the circumstances of this case.

NOW THEREFORE, IT IS HEREBY ORDERED:

1.   The Motion is APPROVED, subject to the conditions described in this order.

2.   All objections to the Motion are OVERRULED.

3.   The Debtors are hereby authorized to execute and perform the Interim Procedures Agreement with Clark, substantially as set forth in the Interim Procedures Agreement attached hereto.

EXHIBIT ___C___
Page ___5___ of __26__ Pages

4.   The entry of this Order and the Debtors' execution of the Interim Procedures Agreement do not constitute an authorization or determination by this Court of the assumption, assumption and assignment, or rejection of any of Debtors' contracts with any project owner, subcontractor, vendor, or joint venture, and all rights, claims, defenses, and objections with respect thereto are reserved by the Debtors, the contracting parties, and all creditors and parties in interest.

5.   Clark and New Atkinson shall be deemed independent contractors under the Interim Procedures Agreement.  Nothing shall be deemed an assumption by Clark or New Atkinson of any liabilities of the Debtors or their affiliates, nor shall Clark or New Atkinson in any manner be responsible for any such liabilities as any successor of Debtors or its affiliates.

DATED:   JAN 0 8 1998   _____

THE HONORABLE THOMAS E. CARLSON
UNITED STATES BANKRUPTCY JUDGE

ORDER AUTHORIZING INTERIM
PROCEDURES AGREEMENT WITH CLARK                  6                    5262\P3818.NS/rs

EXHIBIT _____C_____
Page __6__ of __26__ Pages

## INTERIM PROCEDURES AGREEMENT

THIS INTERIM PROCEDURES AGREEMENT ("Agreement") is entered into this ____ day of _____, 1998, by and between THE CLARK CONSTRUCTION GROUP, INC. and/or its designee or assignee ("Clark"), and GUY F. ATKINSON COMPANY OF CALIFORNIA, GUY F. ATKINSON COMPANY and GUY F. ATKINSON HOLDINGS, LTD. (collectively, "Atkinson" or "Debtors").

### I.
### RECITALS

The Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code on August 10, 1997, in the United States Bankruptcy Court for the Northern District of California, Case No. 97-33695-TC (the "Bankruptcy Court"). The Debtors are one of the largest contractors in the United States, and are currently involved in construction projects throughout the United States and in several overseas countries.

Approximately 90% of the Debtors' projects are bonded by FIDELITY & DEPOSIT COMPANY OF MARYLAND, AMERICAN HOME ASSURANCE COMPANY, and the AMERICAN INTERNATIONAL GROUP OF COMPANIES (collectively, the "Bonding Companies").

The Debtors' principal secured creditors are WELLS FARGO BANK, N.A., the assign(s) of HARRIS TRUST AND SAVINGS BANK, and THE SUMITOMO BANK, LIMITED (collectively, the "Banks") and the Bonding Companies.

On December 8, 1997, the Bankruptcy Court entered an order allowing interested parties to submit reorganization plan term sheets on December 29, 1997, to comment on each other's terms sheets on January 5, 1998, and to submit final reply comments on January 8, 1998. The Bankruptcy Court set a hearing for January 9, 1998, to consider further the Debtors' motion to extend the exclusivity periods in light of the term sheets.

On December 17-18, 1997, representatives of the Debtors, The Clark Construction Group, Inc. ("Clark"), and the Bonding Companies reached agreement on a reorganization plan term sheet (the "Clark Proposal"), which was approved by the Debtors' Board of Directors on December 19, 1997. The Clark Proposal was submitted to the Bankruptcy Court on December 29, 1997. The Clark Proposal and this Agreement contemplate that the Clark Construction Group, Inc. will assign all of its rights and obligations as soon as possible to a subsidiary of The Clark Construction Group (hereafter "New Atkinson").

In view of the delays associated with the filing and solicitation of

EXHIBIT _____ C_____

Page _____ 1 _____ of 26 _____ Pages

votes on a plan, the Debtors, the Banks and the Bonding Companies have agreed that, absent a relationship with a financially capable construction company that can bond new projects and provide motivation to key employees, the Debtors' ongoing value will resemble a "melting ice cube." As such, the Debtors, the Banks, the Bonding Companies and Clark have agreed that, pending the confirmation of a plan, Clark will make available its construction expertise to permit cost-efficient performance of the Debtors' existing contracts by reducing sales and general and administrative expenses, as well as providing the bonding capability to bid new projects and retain current employees.

At the hearing on January ___, 1998, the Bankruptcy Court authorized the Debtors to execute and perform this Agreement ~~as a bridge to a $ 303 asset sale to Clark.~~ ⓘ

The Debtors are party to four different categories of pre-petition construction contracts (together the "Contracts" or the "Projects") as follows:

1.    Sole venture contracts bonded by the Bonding Companies (the "Bonded Contracts" or the "Bonded Projects"). *which means* ~~See Attachment A.~~ *Sole venture projects for which bonds have been provided by AIG & F+D, except State.*

2.    Joint venture contracts in which the Debtors have a controlling interest (the "Sponsored JV Contracts" or the "Sponsored JV Projects"). ~~See Attachment B.~~

3.    Joint venture contracts in which the Debtors do not have a controlling interest (the "Non-sponsored JV Contracts" or the "Non-sponsored JV Projects"). ~~See Attachment C.~~

4.    Sole venture contracts not bonded by the Bonding Companies (the "Unbonded Contracts" or the "Unbonded Projects"). ~~See Attachment D.~~

The Parties desire to provide for the completion of these contracts in a manner which maximizes their value, provides for an orderly transition out of bankruptcy, and preserves the going concern value of the Atkinson name.

WHEREFORE, in consideration of the mutual covenants contained herein, the Debtors and Clark agree as follows:

## II.
## AGREEMENT

### 1.    DUTIES

The Debtors hereby engage and retain Clark as an independent contractor to provide construction management services to the Debtors in

EXHIBIT ___C___
Page ___8___ of ___26___ Pages

accordance with the terms and conditions hereof. This Agreement will terminate upon the earlier of: (a) <the effective date of a confirmed plan of reorganization; or (b) the one-year anniversary of this Agreement, (c)> entry of an order selling assets to Clark under the Clark Term Sheet as supplemented and modified, or (b) January 31, 1998, unless extended by written agreement signed by the parties hereto.

## 2.   THE WORK

Clark will be entitled to interview and hire (or, in the alternative, utilize with reimbursement to the Debtors) any salaried employees of Atkinson. Drawing, in the first instance, upon the key Debtors' personnel (as designated by Clark), Clark shall provide personnel as needed to manage and arrange for the completion of the Projects.

a. On or before ~~February 1~~, *January 31,* 1998, or such other date as *( i )* required by the circumstances, Clark, with consultative assistance from the Debtors, will designate certain of Debtors' salaried employees for prompt hire by new Atkinson as essential to completion of the bonded sole venture backlog, and *( ii )* (if requested by Old Atkinson ~~<1>~~ with the consent of the Banks and the Committee, ~~which consent will not be unreasonably withheld~~, the non-bonded sole venture backlog, processing proofs of claims filed in the bankruptcy cases, collection and liquidation of the assets of the Debtors' estates, and an orderly wind down of Old Atkinson.) *( iii ) and, if required by old Atkinson with consent of Bankers and Committee which consent shall not be unreasonably withheld)*

b. On or before ~~February 1,~~ *January 31,* 1998, or such other date as required by the circumstances, Clark will designate certain of Debtors' salaried employees for prompt hire by new Atkinson to work on obtaining new jobs.

c. On or before ~~February 1,~~ *January 31,* 1998, or such other date as required by the circumstances, Clark will designate from the 16 individuals listed by Debtors as "Senior Executives" those whom Clark believes are category (a) or (b) employees.

d. ~~The Bonding Companies will continue in effect until January 31, 1998 the DIP credit facility so that Debtors can pay New Atkinson the~~ costs associated with work by category (a) employees on bonded projects *will be paid from the DIP credit facility for work performed before January 31, 1998.*

e. New Atkinson will pay from its own financing the costs associated with category (b) employees.

f. The cost of employees whose duties include ~~category (b) and category (a)~~ *Bonded Projects and new work* work will be paid pro rata from the DIP credit facility ~~(until January 31, 1998)~~ and from New Atkinson's own financing.

EXHIBIT ___C___
Page____9___ of _26_ Pages

*may*
g.     The Bonding Companies ~~<and/or New Atkinson may>~~ ~~will~~ *may* fund from the DIP credit facility (up to the budgeted amounts approved in the October 31 Third Order) an employee retention benefit which has already been approved by the Court ~~<to incentivize category (a) employees to remain employed by New Atkinson until their services are no longer needed on the bonded backlog>~~. ~~To be eligible, category (a) employees must release their rights under any other employee retention plans and execute an appropriate release of all other employment claims.~~

~~<h. The Bonding Companies will fund from the DIP credit facility compensation for employees to remain employed by Debtors through January 23, 1998 on Bonded Projects. To be eligible, category (a) and (b) employees must release their rights under any other employee-retention plans and execute an appropriate release of all other employment claims.>~~

*January 31,*

~~<i>~~ h.     Clark and the Bonding Companies ~~will~~ *may* offer ad hoc compensation packages to category (c) employees on or before ~~February 1,~~ 1998, or such other date as required by the circumstances.  To be eligible, category (c) employees must release their rights under any other employee retention plans and, upon receipt of the termination payment, execute an appropriate release of all other employment claims.

3.     **SERVICES**

The following is a list of minimum level services required from Clark:

Paragraph a. through ~~<b>~~ j. apply only to Bonded Projects and apply to unbonded sole venture projects only to the extent requested by Old Atkinson, and the Banks.

a.     **Management and Oversight**

Clark shall manage and oversee the work on the Projects, including, but not limited to, administrative activities relative to the Owners of the various projects ("Owners") (and their respective consultants, engineers and other representatives), representatives of the Debtors, subcontractors, suppliers, and materialmen on the Projects.

b.     **Coordination Between Trades**

Clark shall manage all subcontractors, suppliers, and materialmen on the Projects and coordinate the work between the different trades on the Projects in accordance with the Bonding Companies', Banks' and Debtors' objectives of cost, time and quality and provide sufficient management personnel at the Project site.  The Debtors, Banks, and Bonding Companies hereby grant Clark with the

EXHIBIT _____ C
Page ___ 10 ___ of ___ 26 ___ Pages

authority to work towards achieving these objectives. Clark shall make reasonable efforts to utilize Debtors' subcontractors, suppliers, and materialmen so long as they are acceptable to Owners to maximize efficiency in completing the work.

### c.    Scheduling

Clark shall update Project schedules. Clark shall also establish line item budgets to complete the Projects and manage the work toward meeting the budget goals. Clark shall also provide regular monitoring of the Project schedules as construction progresses, identify potential variances between schedules and completion dates; review schedules for work not started or incomplete and recommend to the Owners adjustments in the schedule to meet completion dates; and provide summary reports of monitoring and document all changes in schedule.

### d.    Quality Control and Inspection

Clark shall maintain quality control of work performed on the Projects. In particular, Clark shall inspect the work or cause others to inspect the work of subcontractors for conformance with the requirements of the Contract Documents; endeavor to guard against defects and deficiencies in the Projects; require any subcontractor to stop work or any portion thereof, and require special inspection or testing of any work that it believes to be not in accordance with the provisions of the Contract Documents whether or not such work be then fabricated, installed or completed, and reject work which it determines does not conform to the requirements of the Contract Documents.

### e.    Liaison

Clark shall act as a liaison between the Owners and the remaining personnel of Debtors. Clark shall consult with the Owners if any subcontractor requests interpretations of the meaning and intent of the plans, drawings and specifications of the Projects and otherwise assist in the resolution of any questions which may arise on the Projects.

### f.    Plans, Shop Drawings and Specifications

In collaboration with the Owners, Clark shall establish and implement procedures for expediting the processing and approval of shop drawings and samples  Clark shall maintain at the Project sites, on a current basis, records of all contracts; shop drawings, samples; purchases; materials, equipment; applicable handbooks; federal, commercial and technical standards and specifications; maintenance and operating manuals and instructions; and any other related documents and revisions which arise out of the Contracts. Clark shall obtain data from subcontractors and maintain a current set of record drawings, specifications and operating manuals. At the completion of the Projects, Clark shall deliver all

5262\0116D PAM\BLK                    5

EXHIBIT _____ C _____

Page _____ 11 ___ of _ 26 __ Pages

such records to the Owners.

~~g.     Reports and Progress Meetings~~

Clark shall record the progress of the Projects; submit written
progress reports to the Bonding Companies, Banks and Debtors, including
information on the subcontractors, the percentage of completion and the number
and amounts of Change Orders; and keep a daily log available to the Bonding
Companies, Banks and Debtors. Clark shall also schedule and conduct progress
meetings at which the Owners (its consultants, engineers and other
representatives), Clark, and subcontractors, as necessary, can discuss jointly such
matters as procedures, progress, problems and scheduling.

An Executive Committee will consist of three members; one from the
Debtors, one from the Bonding Companies (until paid in full), and one from New
Atkinson (a Clark Executive). William M. Shook, Executive Vice President and
Regional Executive Officer, will be the Clark representative on the Executive
committee.  Mr. Shook is a 20-year Clark veteran.

This Committee will meet monthly to review and evaluate operations
information regarding bonded jobs and joint ventures [if requested by Old Atkinson
with Banks' consent]. The purpose of the Executive committee will be to identify
significant operational issues, review the concerns with senior management of the
Debtors, and suggest plans of corrective action. The Executive Committee will
~~also assist the Debtors in reduction of overhead expenses.~~

h.     Storage

Clark shall coordinate delivery and storage, protection and security for
all purchased materials, systems and equipment which are part of the Projects,
until such items are incorporated into the Projects.

i.     Negotiations

Clark shall participate in negotiations for Owner and Contractor
Proposed Change Orders, unilateral and bilateral modifications, modification
proposal request (MPR), and Requests for Information (RFI); provided, however,
any pursuit by Clark of claims or change orders that proceed to formal claims,
proceedings, arbitration, ADR or litigation shall be the subject of a separate
agreement.

j.     Purchasing

Clark shall manage and arrange for the rental of equipment (if
necessary) and purchase of materials and supplies required by the Contract

EXHIBIT ____C____
Page __12__ of __26__ Pages

Documents for the Projects.

k.    **Payment Documentation**

Clark shall maintain invoices, vouchers, and other evidence of payments made and costs incurred by Clark in completing the Projects and performing its duties under this Agreement.

l.    **Close-Out**

Clark shall obtain all required close-out documentation to include warranties, as-built drawings and final certificates of completion for the Projects.

m.    **Availability of Employees**

Clark or New Atkinson shall make available as needed former Atkinson employees to Old Atkinson and its estate representative to manage Pool II Assets, process proofs of claims filed in the bankruptcy cases, collect and liquidate the assets of the Debtors' estates, complete the non-bonded sole venture projects, and assist in an orderly wind down of Old Atkinson.

This list is not intended to be all inclusive. There may be additional services reasonably required by Clark on the Projects within the general scope of services described above. *Expenditures by the Debtor Through January 31, 1998 shall not exceed the Budget Filed with the court October 23, 1997*

4.    **TIME OF COMMENCEMENT** *except to the extent of the Clark Fee.*

Clark shall commence performance of the Work upon execution hereof. *There shall be no obligations arising under this Agreement after January 31, 1998.*

5.    **COMPENSATION**

The Debtors shall pay New Atkinson the total cost of New Atkinson and Clark employees deemed, with the concurrence of the Bonding Companies and the Banks who are providing the financing of such costs, necessary to the performance of the Work through January 31, 1998. Thereafter costs are borne by Bonding Companies. *on Bonded Projects taken over by the Bonding Companies.* The Debtors' salaried employees who transfer to New Atkinson or Clark pursuant to Section 2 above and employees hired by New Atkinson in place of those employees of the Debtors who either decline to transfer to New Atkinson or Clark or, having transferred, depart before completion of the Work, will be covered by such cost reimbursement to the extent they are involved in discharging functions (including but not limited to accounting, administrative, executive and supervisory functions) necessary to the performance of the Work. Costs shall include compensation (salary and bonus), statutory costs (FICA and unemployment taxes), benefits (profit sharing and 401(k) plans; health, life and

62620118D PAM\BLK

EXHIBIT _____ C
Page _13_ of _26_ Pages

disability insurance), collision, crime and fiduciary insurance, and workers' compensation insurance. Costs shall also include all other costs necessarily incurred in the proper performance of the Work, including but not limited to automobile, travel and lodging, telephone and beeper, and personal computing equipment and related software costs. In the event any New Atkinson or Clark employee is working on both the Debtors' Projects and new work, the parties shall make reasonable allocations of costs. In the case of general and administrative expenses (including but not limited to space and equipment leases) that relate to both existing Debtors' Projects and new work, the parties shall make reasonable allocations. Costs shall not include the costs of the CEO, President or CFO of The Clark Construction Group, Inc., other than travel and lodging relating to the Work, nor Wilson Shook's services on the Executive Committee. To the extent that Mr. Shook performs direct functions for a specific project, the Debtors shall pay Clark for the total cost thereof. ~~include under this Agreement~~  *include under this Agreement*

The Debtors shall pay New Atkinson a management fee of: (1) in the case of Bonded Projects, ~~the Sponsored JV Projects~~ ~~which the Bonding Companies choose to fund~~, and the Unbonded **Projects and the Sponsored JV** Projects which the Debtors and Banks choose to ~~fund~~ 2% of the Debtors' costs; or, (2) in the case of Non-sponsored JV Projects which the Debtors and the Banks choose to ~~fund~~, 1 % of the Debtors' cost (ie., the Debtors' proportionate share of the overall joint venture project cost and related joint venture costs). The Clark Fees shall be paid, in the first instance, from the proceeds on a project-by-project basis. The fee is payable by the Debtors on Bonded Projects only through January *31, 1998* ~~23, 1997~~ and is thereafter payable on Bonded Projects by the Bonding Companies. "Costs" means costs incurred to complete each project. *include in this Agreement*

In addition to the compensation described above, the Debtors shall pay project incentives related to schedule, close-out and budget, to be agreed upon by Clark, the Debtors and the Bonding Companies and the Banks who are providing the financing for such projects. The incentives shall be designed to reward Clark for reducing the project losses, thereby reducing the claims against the Debtors' estate.

In the event that Clark determines that it is necessary to assign substantially more Clark employees to perform the Work than is presently contemplated by Clark, the interested parties shall agree upon appropriate arrangements therefor. If the interested parties are unable to agree, Clark shall not be obligated to assign such employees to the Work.

All compensation and costs incurred by Clark for which the Debtors are liable, ~~as set forth above,~~ shall constitute an expense of administration in Debtors' chapter 11 cases under Sections 503(b)(1), 362(d) and 363(e) of the Code, which administrative expense shall have priority equal to all other expenses of administration under Section 507(a)(1) of the Code. With respect to all claims *under this Agreement,*

EXHIBIT C
Page 17 of 26 Pages

arising in favor of Clark with respect to a project under this Agreement, the Bonding Companies and Banks shall unconditionally subordinate any and all right, title and security interest which the Banks and Bonding Companies may presently have or may hereafter acquire in and to all proceeds from such Project, pro rata to the extent of their interests in such projects, pursuant to Section 364(d) of the Code. The Bonding Companies and the Banks, respectively, shall so subordinate only to the extent of their respective liabilities to Clark under this Agreement.

### 6.   INDEPENDENT CONTRACTOR

At all times during the term of this Agreement, Clark will be considered, for all purposes, an independent contractor and agent. Clark shall incur no liability or penalty of any kind for failure of the Debtors to meet any contractually required completion dates or any cost in excess of the adjusted Contract Sum or Guaranteed Maximum Cost. Further, the parties recognize and agree that Clark is operating as a "not at risk" Construction Manager and, therefore, is not liable for the failure of any subcontractor, supplier or others to perform.

### 7.   PROJECT EMPLOYEES

Notwithstanding the language or operation of any term in this Agreement or any other agreement or understanding, with respect to any and all union personnel employed on the Projects, including but not limited to union personnel employed to work on the Projects by Debtors ("Project Employees"), Debtors shall be the sole and exclusive employer of Project Employees, and Clark shall have no control or authority over the setting of wages, hours, and fringe benefits of Project Employees; shall not supervise or direct the work of Project Employees; shall not establish job titles, job classifications, or job duties for Project Employees; shall not establish personnel or payroll policies, nor implement or enforce work and safety rules for Project Employees; shall not provide handbooks or employee manuals for Project Employees; shall not control, direct or participate in recruiting, interviewing, or hiring Project Employees; shall not schedule hours of work for nor make work assignments to Project Employees; and shall not control, direct, or participate in any collective bargaining nor decide or implement labor relations policy relating to Project Employees. Clark shall at all times be limited to management of the completion of the work on the Projects and shall not be a joint employer or single employer of, or successor to the labor and employment responsibilities, obligations, or liabilities of Atkinson in regard to, Project Employees. It is contemplated that Debtors shall retain as their employees certain salaried supervisory employees to the extent necessary to perform the functions hereinabove described in this Article.

8.   FUNDING OF PROJECT COMPLETION AND RELATED ACCOUNT(S)

EXHIBIT ___C___
Page _15_ of _26_ Pages

~~<Funding>~~ Payment mechanics and processing/check shall be consistent with agreements among the Debtors, the Bonding Companies and Clark with respect to Bonded Projects. ~~<Funding>~~ Payment mechanisms for nonbonded projects and joint ventures will be consistent with agreements among the Debtors the Banks, the Committee and Clark *and Cons et ant with the Supplement to the LPA.*

9.   PAYMENT

Clark employees shall see to the payment of all amounts in accordance with Section 8.

*#8 and 9 are deleted*

10.   INSURANCE

Clark shall provide insurance consistent with the obligations assumed by it under this Agreement. Clark shall deliver to the Debtors and the Bonding Companies copies of Certificates of Insurance for all such insurance policies. Clark at all times agrees to observe and comply with all federal, state, city and county laws, ordinances and regulations bearing on the performance of its obligations hereunder.

11.   ASSIGNABILITY

Clark agrees that it will not assign this Agreement or any part thereof except to an entity in which it has a controlling interest without the prior written consent of the Bonding Companies, Banks and Debtors. The Bonding Companies, Banks and Debtors hereby consent to any assignment by Clark to another entity in which Clark has a controlling interest, including to New Atkinson. Upon such assignment, The Clark Construction Group shall have no further obligations hereunder. Upon such assignment all references herein to Clark shall be deemed a reference to New Atkinson.

12.   BONDING COMPANIES' OBLIGATIONS

It is understood and agreed that the Bonding Companies do not by virtue of this Agreement undertake or assume any obligations to the Owners other than the obligations which the Bonding Companies have under the Bonds, or which it assumes towards Clark pursuant to the terms of this Agreement. It is further understood and agreed that the rights and remedies provided hereunder for the Bonding Companies shall be in addition to and not in derogation, substitution or limitation of any rights and remedies against the Debtors which otherwise are vested in the Bonding Companies by reason of any indemnity agreements, bonds, equitable subrogation or otherwise.

13.   EVENTS OF DEFAULT BY CLARK

EXHIBIT _____ *C*
Page __ *16* __ of __ *26* __ Pages

The following shall constitute events of default by Clark:

a.  The failure to proceed provided the Debtors and Bonding Companies and Banks have met their obligations under this Agreement.

b.  The failure of Clark to comply with the material provisions of this Agreement.

### 14.  RIGHTS ON DEFAULT

The Debtors shall notify Clark in writing of any event of default and shall give seven (7) days notice to Clark to commence cure of such default. If such default by Clark is not cured within a reasonable time, Debtors shall have the right to terminate this Agreement for convenience.

### 15.  GUARANTEE OF PAYMENT

~~This~~ Performance of work by Clark under this Agreement is contingent upon the Banks and the Bonding Companies, as their interests may appear, providing assurances, satisfactory to Clark, of payment of amounts due Clark under this Agreement and any and all modifications thereto.

The amounts due Clark from the Debtors with respect to any project shall cease with notice to Clark at termination of financing for such project and payment of costs and fees earned to the date of such notice plus reasonable demobilization expenses arising as a result of such termination; provided, however, that in the event of, and prior to, any termination of financing for the Olmstead Lock and Dam joint venture, the management fee must be renegotiated; and provided further, that in the event of termination of financing for the Buck Center or University of Connecticut projects, Clark shall earn a fee of 1/2% of the contract balance remaining at the time of such termination.

*31,*

Nothing in this agreement shall obligate the Debtors to fund fees or expenses of Clark incurred on Bonded Projects after January *31,* 1998, provided that Bonding Companies reserve all their claims of indemnity and equitable rights of subrogation against the Debtors for any amounts that the Bonding Companies pay Clark. *Nothing herein prejudices the Committee's rights under §506(c), all of which are reserved, except for Clark which has*

### 16.  INDEMNIFICATION *no §506(c) liability.*

With respect to the Bonded Projects on which the Bonding Companies request Clark services under this Agreement, the Bonding Companies agree to indemnify and save harmless Clark and its affiliated companies and any of their officers, agents and employees from and against any claims, damages, losses or expenses including reasonable attorneys' fees arising out of or related to the

EXHIBIT ___C___
Page___17___of__26__Pages

prosecution of the work under this Agreement; provided, however, that the Bonding Companies make no indemnities with respect to any claims against Clark by reason of Clark's negligence or willful misconduct.

_or unbonded project_

With respect to a Sponsored or Non-sponsored JV Project on which _or_ Clark services are requested under this Agreement, the Bonding Companies and the Banks, ~~to the extent of their interests in the proceeds thereof, solely form funds collected therefrom hereafter,~~ agree to indemnify and save harmless Clark and its affiliated companies and any of their officers, agents and employees from and against any claims, damages, losses or expenses including reasonable attorneys' fees arising ~~out of~~ or related to the prosecution of the work under such project, provided, however, that the Bonding Companies and the Banks make no ~~indemnities with respect to any claims against Clark by reason of Clark's negligence or willful misconduct.~~ _will provide indemnity satisfactory to Clark as a condition to work._

With respect to the Unbonded Projects on which the Banks request Clark services under this Agreement, the Banks, ~~to the extent of their interests in the proceeds thereof solely from funds collected therefrom hereafter,~~ agree to indemnify and save harmless Clark and its affiliated companies and any of their officers, agents and employees from and against any claims, damages, losses or expenses including reasonable attorneys' fees arising out of or related to the prosecution of the work under this Agreement; provided, however, that the Banks make ~~no indemnities with respect to any claims against Clark by reason of Clark's negligence or willful misconduct.~~

## 17.   NEW BUSINESS

The Debtors, Clark, the Bonding Companies, and the Banks recognize that it is in the best interests of the estate for Clark to pursue new business opportunities during the term of this Agreement and prior to the effective date of a confirmed plan of reorganization.  Accordingly, Clark shall be entitled to bid on, enter into contracts upon successful bids, and perform work on such new projects using the name of "Atkinson" and all other trade names of the Debtors and any and all affiliates of the Debtors (collectively, "Trade Names").  Except as required to continue existing projects, the Debtors will not be entitled to use the Trade Names.  Upon the termination of this Agreement, Clark will be entitled to continue to use the Trade Names in all projects bid upon in the "Atkinson" name from January 1, 1998 through termination of this Agreement.

## 18.   JURISDICTION AND ATTORNEYS' FEES

In the event that it is necessary for any party to seek enforcement of this Agreement, the parties agree that it will be interpreted Under California law and applicable federal law.  The prevailing party in any enforcement action shall recover reasonable attorneys' fee from the losing party, both on the trial and

EXHIBIT _C_
Page _18_ of _26_ Pages

appellate level. Any dispute among the parties arising out of or related to this Agreement shall be determined by the Bankruptcy Court as a core proceeding, without a jury trial.

### 19.   NOTICES

All notices given under any of the provisions of this Agreement shall be deemed to have been duly given if mailed by registered or certified mail, return receipt requested to:

AMERICAN INTERNATIONAL GROUP
175 WATER STREET, 6TH FLOOR
NEW YORK, NEW YORK 10038

FIDELITY & DEPOSIT COMPANY OF MARYLAND
300 SAINT PAUL PLACE
BALTIMORE, MARYLAND 21203

GUY F. ATKINSON COMPANY OF CALIFORNIA,
GUY F. ATKINSON COMPANY and
GUY F. ATKINSON HOLDINGS, LTD.
1001 BAYHILL DRIVE, 2ND FLOOR
SAN BRUNO, CA 94066

THE CLARK CONSTRUCTION GROUP, INC.
7500 OLD GEORGETOWN ROAD
BETHESDA, MD 20814

HENRY C. KEVANE, ESQ.
PACHULSKI, STANG, ZIEHL & YOUNG
350 CALIFORNIA STREET, SUITE 2020
SAN FRANCISCO, CA 94104

**P. STEVE DOBEL**
**SENIOR VICE PRESIDENT**
**WELLS FARGO BANK**
**111 SUTTER STREET, 17TH FLOOR**
**SAN FRANCISCO, CA 94104**

or at such other address as each of the foregoing may designate in writing by registered or certified mail, return receipt requested, to the other.

### 20.   MISCELLANEOUS PROVISIONS

The parties further agree as follows:

EXHIBIT _____C_____
Page _17_ of _26_ Pages

a.    The headings of this Agreement are for convenience only and are not a part of the substance of this Agreement.

b.    All of the grants, covenants, terms, provisions and conditions herein shall apply to, be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto.

c.    In the event of any ambiguity in this instrument, neither party shall be deemed to be the author thereof.

d.    The parties do not rely upon any representations of the other party except as may be set forth in this Agreement and the Contract Documents as outlined in this Agreement.

e.    Income taxes incurred or sustained by Clark in connection with its performance of the Work are not reimbursable.

### 21.    CLARK ACCESS

The Debtors agree to permit Clark and its employees, agents and representatives reasonable access to (a) the premises of the Debtors and (b) all the books, computer software application systems, files and records of the Debtors, including, but not limited to, lease, loan, real estate, financial, tax and personnel files and records, and to furnish Clark such financial and operating data and other information with respect to the business, assets and properties of the Debtors as Clark shall request, for the purpose of conducting a complete and thorough investigation and review of the Debtors' business. The Debtors shall authorize its accountants to provide Clark with their working papers for the Debtors' financial statements. The Debtors shall make its officers and other employees available to Clark and its employees, agents and representatives to respond to questions and requests for information in connection with Clark's due diligence investigation. The Debtors shall keep Clark informed of all material developments involving its business, operations and activities (whether or not covered by insurance). The Debtors hereby consent to Clark and its affiliates and any employees, officers, directors and representatives thereof contacting the Debtors' lenders, attorneys, accountants, financial advisors, creditors, bonding companies, suppliers and customers in connection with the transaction contemplated hereby. The Debtors agree to use best efforts to obtain the consent of the Debtors' joint ventures for such joint ventures to permit Clark access to the types of information and personnel described herein.

Proprietary financial and business information, and all matters covered by any attorney-client, joint defense, or other privilege, which Clark obtains pursuant to this Agreement is Confidential Information. Clark will not disclose Confidential Information to third parties except to the extent required to do so by

EXHIBIT _____ C

Page __20__ of __26__ Pages

order of a court or pursuant to the published rules of a government agency, in which event Clark will give the Debtors prompt notice of the order or request so that they may seek a protective order, or in connection with bankruptcy proceedings involving the Debtors, in which event Clark will make reasonable efforts to have the Confidential Information filed under seal.

~~<22. INCENTIVE PLAN~~

~~There shall be an employee retention benefit to incentivize employees to remain employed by the Debtors, New Atkinson, or Clark until their services are no longer needed with respect to the Projects, with terms to be agreed by Debtors, Clark, the Bonding Companies (for benefits to be funded by them) and the Banks (for benefits to be funded by them), subject to Bankruptcy Court approval.~~>

### ~~<23>~~ 22.  ENTIRE AGREEMENT

This Agreement shall constitute the entire Agreement between the parties with respect to the Projects and any and all previous agreements between the parties (if any) with respect to the Projects shall be deemed null and void.  This Agreement may not be modified or amended except in a writing signed by the parties.

IN WITNESS WHEREOF, Debtors and Clark have executed this Agreement on the date first above written.

"CLARK"

THE CLARK CONSTRUCTION GROUP, INC.

By _____

Its _____

"ATKINSON"/"DEBTORS"

GUY F. ATKINSON COMPANY OF CALIFORNIA

By _____

Its _____

EXHIBIT _____ C _____
Page __21__ of __26__ Pages

GUY F. ATKINSON COMPANY

By _____

Its _____ Chairman & CEO


GUY F. ATKINSON HOLDINGS, LTD.

By _____

Its _____ Chairman & CEO


Accepted as to the obligations of the Bonding Companies:

AMERICAN INSURANCE GROUP (AIG)

By _____

Its _On behalf of A.I.G._


FIDELITY & DEPOSIT COMPANY OF
MARYLAND

By _____

Its _____


Accepted as to the obligations of the Banks:

WELLS FARGO BANK N.A., FOR ITSELF,
AND AS AGENT FOR THE BANKS

By _____

Its _____

EXHIBIT _____C_____
Page __22__ of __26__ Pages

~~DRAFT January 8, 1998    5:00pm~~

GUY F. ATKINSON COMPANY

By _____

Its _____


GUY F. ATKINSON HOLDINGS, LTD.

By _____

Its _____


Accepted as to the obligations of the Bonding Companies:

AMERICAN INSURANCE GROUP (AIG)

By _____

Its _____


FIDELITY & DEPOSIT COMPANY OF
MARYLAND

By _____

Its _____


Accepted as to the obligations of the Banks:

WELLS FARGO BANK N.A., FOR ITSELF,
AND AS AGENT FOR THE BANKS

By _____

Its _____

EXHIBIT _____ C
Page 23 of 26 Pages

*[handwritten top margin: at Debtors, DMC con ...]*

## SUPPLEMENT TO
## IPA

*[handwritten: Applicable to]*

Notwithstanding anything to the contrary in the Interim Procedures Agreement ("IPA"):

1.  Immediate entry into IPA, applicable to Bonded Jobs, ~~and Joint Ventures; excluding~~ *[handwritten: and]* Non Bonded Jobs.  Bonded Jobs fees paid out of DIP Line until earlier of 363 sale or January 31.  Joint Venture fees paid out of Bank of America account until earlier of 363 sale or January 31.  The IPA shall terminate effective January 31, 1998.

2.  Effective immediately, Clark has full access to all Atkinson employees and may approach Atkinson employees on both Bonded and Unbonded Jobs with firm offers of employment.  Such employment may begin immediately and will be on such salary and benefit terms as Clark and the Bonding Companies choose to offer.  Such employees may be rented back under the IPA.

3.  Effective January 31, 1998, or on such earlier date as the Bonding Companies may designate, the Bonding Companies shall take over the Bonded Projects without further notice of any kind to any party and without any hearing of any kind.  Thereafter the estate shall have no further interest in the Bonded Projects *[handwritten: and shall have no obligation to pay Clark fees and costs incurred after such date.]*

4.  No later than January 31, 1998, Clark will purchase the assets of the Debtors pursuant to a purchase agreement satisfactory to Clark, that agrees to purchase such assets essentially on the terms of the Clark Proposal signed by the Debtors and Clark on December 18, 1997, provided however, that: *[handwritten: close the asset purchase agreement]*

    *[handwritten: (INSERT 4A)]*

    *[handwritten left margin: As a condition to closing an asset purchase agreement]*

    a.  if all of the work contemplated by the Term Sheet is not available under the Purchase Agreement, there shall be no obligation to ~~purchase such assets~~ on the part of Clark; *[handwritten: to be]*

    b.  *[handwritten: and costs]* payment arrangements, ~~satisfactory~~ to Clark in its sole discretion, shall be made to pay all fees to Clark in connection with completion of work on the jobs covered by ~~the Clark Proposal; and,~~ *[handwritten: any asset purchase agreement that might be agreed to]*

    c.  If there is no sale, Clark can use the Atkinson name to complete projects bid upon by Clark prior to January 31, 1998, can retain all former Atkinson employees who wish to remain employed by Clark, and shall have no obligation whatsoever with respect to Joint Ventures or Unbonded Projects.

5.  The Bonding Companies shall pay no expenses in connection with said 363 sale other than for its own counsel and agents, whether or not sale is closed.

*[handwritten: Notwithstanding the foregoing, the bankruptcy estate shall retain jurisdiction over the allowance of claims against the Debtors by the Bonding Companies or the major owners.]*

*[handwritten left margin: Revised A095H]*

5262.Jdocs.ms

EXHIBIT _____C_____
Page __24__ of __26__ Pages

INSERT 4A

adjusted to reflect changes in
assets transferred, services to
be performed by Clark, and the
timing of the notice to Clark
of the scope of services to be performed.

EXHIBIT ___C___
Page 25 of 26 Pages

6. The DIP Line shall terminate permanently effective January 31, 1998.

7. *The Debtor will pay Clark a signing Fee of ~~$1 mm.~~*

Debtors

Wells Fargo on Behalf of the Banks

The Bonding Companies

The Official Unsecured Creditors' Committee

*2% of the Debtor's costs on Sponsored Joint Venture Projects and unbonded Projects and 1% of Debtor's costs on Non Sponsored Joint Venture Projects. "Costs" means costs incurred to complete each project during the period from January 9, 1998 through January 31, 1998. Said fee shall be paid January 29, 1998.*

8. *Nothing herein prejudices the Committee's rights under § 506 (c), all of which are reserved, except for Clark which has no § 506 (c) liability.*